OPINION
{¶ 1} The plaintiffs-appellants/cross-appellees, Eugene and Karen Bellman, appeal the judgments of the Putnam County Court of Common Pleas following the November 5, 2004 jury verdict in their favor in the amount of $90,000. The defendant-appellee/cross-appellant, Ford Motor Company (hereinafter "Ford"), appeals the April 10, 2003 judgment of the Putnam County Court of Common Pleas denying its motion for summary judgment.
 {¶ 2} The Bellmans were the sole owners and operators of Bellman Ford-Mercury, Inc., a Ford Automobile dealership in Ottawa, Ohio from 1983 until December 1996. On February 13, 1996, Eugene met with two representatives from Ford on an unrelated matter concerning a pay scale transition for the employees in the repair department. At the conclusion of that meeting, one of the Ford representatives asked Eugene if he was interested in selling his dealership. Eugene replied that he was. Accordingly, Eugene signed a letter requesting Ford's assistance in selling his dealership.[1]
 {¶ 3} Following that meeting, Eugene met with Anthony Wolf, the Regional Manager for the Detroit Region of the Dealer Development Program[2] in Ottawa to evaluate the dealership's assets. Following the meeting with Wolf, Eugene requested that his accountant, Gary Konst, perform a separate audit and evaluation of the dealership's assets. Both Eugene and Wolf met again in March to "compare numbers" and determine whether selling the dealership was possible. They concluded that it was because the asset evaluations of both Wolf and Konst were similar.
 {¶ 4} Sale negotiations continued over the next few months. The negotiations centered on the sale of inventory, which included new and used cars, and other assets, such as office furniture and automobile parts. In the meantime, the Dealer Development Division of Ford created Ottawa Ford, Inc., a Delaware corporation separate from Ford to purchase Bellman Ford-Mercury. Ottawa Ford offered Eugene $800,000 to sell Bellman Ford-Mercury. This price included only the assets and did not include the real property, which allegedly made Eugene uneasy because Eugene did not want Ottawa Ford to purchase Bellman Ford-Mercury and then leave. Consequently, Eugene met with Wolf and Theodore Goellner, the Regional Sales Manager for Ford Motor Company, and verbally received a commitment that Ford was "going to be there and not just come in and take over things and then leave." Trial Tr. at p. 109.
 {¶ 5} In October and November 1996, Eugene continually insisted that the verbal agreement he made with Wolf and Goellner be transferred into writing. Eugene requested a guarantee, for him and his employees that Ford would maintain the dealership for at least ten years. In response, both Goellner and Wolf reassured Eugene that the Dealer Development Division will try three "operators" at a new dealership. If, after three "operators" the business continued to do poorly, then Ford would sell the dealership to a private individual to be run as a private dealership.
 {¶ 6} In late November 1996, Eugene met with Colleen Robinson, the new "operator" of Ottawa Ford.[3] Around the same time, the Bellmans learned that Mike Pruitt, the owner of a Ford dealership in Lima, Ohio, would also be assisting in developing Ottawa Ford for "financial reasons." In fact, Pruitt and Robinson formed a partnership, R P Associates, where Pruitt invested approximately thirty percent into Ottawa Ford.[4]
 {¶ 7} In early December 1996, employees from Ford visited Bellman Ford-Mercury for final negotiations, which mainly included the sale of the used cars on the lot. On December 12, Eugene received a package from Ford that contained an "option to purchase" his dealership, which was signed by Eugene on October 24, 1996.[5] Moreover, he also received an "option to lease" from Ford, which was also signed October 24, 1996. Finally, the package also contained a letter from Goellner stating:
It's our understanding that you will lease facilities ofOttawa Ford-Mercury for a term commencing no later than December9, 1996, and ending ten years later, and the facility will meetour standards for Ford dealership.
 Our marketing studies for the entire Ottawa area indicate thatthe proposed location is desirable for a Ford dealership and weadvise you that we intend to have a dealer there for the ten-yearperiod commencing December 9, 1996.
* * *
Landlord understands and hereby acknowledges that Ford MotorCompany shall have no obligation whatsoever to appoint anyreplacement dealer in the event of a termination with of [sic]the Ford Sales and Service Agreement with Ottawa Ford-Mercury,Inc. or any replacement dealer, and nothing contained in thisletter shall be construed as imposing upon Ford Motor Company anysuch obligation to appoint a replacement dealer.
Letter from Goellner to Bellman dated December 9, 1996.
 {¶ 8} The Bellmans sold their dealership on December 12, 1996 for $800,000, which ultimately included assets, goodwill, and a non-competition clause. The sale did not include the real property, which was leased back to Ottawa Ford as tenants in a separate agreement. The lease agreement was for a ten year lease, and the terms of the lease were monthly rental payment of $10,500 for each of the first twelve months; $9,500 for each of the next twelve months; $8,200 for each of the next twelve months; and $7,000 for the remaining 84 months, which totaled $926,400.00.
 {¶ 9} Ottawa Ford operated as a dealership until it closed in June 1998.[6] Eugene contacted Ford to provide a list of people, including himself, that were interested in purchasing Ottawa Ford and maintaining a dealership on the premises, but Ford told Eugene that Ottawa Ford was "closed, and it's going to stay closed." Trial Tr. at 121.
 {¶ 10} Ottawa Ford made their last lease payment in April of 1999. Subsequently, the Bellmans leased the premises to the Putnam County Commissioners for ten months for $1,997 per month and Sky Bank for six months for $450 per month. Ultimately, the Bellmans sold the land to the Putnam County Council on Aging in 2001 for $383,500. Because the Bellmans sold the premises to the Council on Aging, they were able to receive a tax deduction of approximately $160,000.
 {¶ 11} On August 26, 2002, the Bellmans filed a complaint against Ford, R P Associates, Pruitt, and Robinson alleging, inter alia, fraud and breach of lease agreement. On the fraud claim, the Bellmans allege that Ford engaged in fraud during the sale and negotiations between the Bellmans and Ottawa Ford. All the defendants moved for summary judgment, and the trial court granted summary judgment in favor of Pruitt, Robinson, and R P Associates and denied summary judgment against Ford.
 {¶ 12} On August 2, 2004, a jury trial commenced against Ford on the sole issue of fraud. On August 5, 2004, the jury returned a verdict in favor of the Bellmans and awarded them $90,000 in damages. On August 19, 2004, the Bellmans filed a motion for judgment notwithstanding the verdict, or, in the alternative, a new trial based on the amount of damages. Furthermore, the Bellmans filed a motion for prejudgment interest. The trial court denied all motions, and the Bellmans and Ford appeal.
 {¶ 13} The Bellmans assert three assignments of error stemming from the trial court judgment denying their motions for JNOV, a new trial, and prejudgment interest. Ford cross-appeals alleging that the trial court erred in denying their motion for summary judgment. For the sake of simplicity, Ford's assignment of error will be discussed first.
 Ford's Assignment of Error The trial court erred when it denied ford's motion for summary judgment because the bellmans could not have justifiably relied on the alleged fraudulent statements. {¶ 14} The standard for review of a grant of summary judgment is one of de novo review. Lorain Nat'l Bank v. Saratoga Apts.
(1989), 61 Ohio St.3d 127, 129, 572 N.E.2d 198. Thus, such a grant will be affirmed only where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In addition, "summary judgment shall not be rendered unless it appears . . . that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence construed most strongly in his favor." Id.
 {¶ 15} The moving party may make his motion for summary judgment in his favor "with or without supporting affidavits[.]" CivR. 56(B). However, "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. Summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the nonmovant. Murphy v.Reynoldsburg (1992), 65 Ohio St.3d 356, 360, 604 N.E.2d 138. Once the moving party demonstrates that he is entitled to summary judgment, the burden then shifts to the non-moving party to show why summary judgment in favor of the moving party should not be had. See Civ.R. 56(E). In fact, "[i]f he does not so respond, summary judgment, if appropriate, shall be rendered against him."Id.
 {¶ 16} A trial court's judgment denying a motion for summary judgment is reviewable on appeal by the movant from a subsequent adverse final judgment. Balson v. Dodds (1980),62 Ohio St.2d 287, 405 N.E.2d 293, at paragraph one of the syllabus. Nevertheless, "[a]ny error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made."Continental Ins. v. Whittington (1994), 71 Ohio St.3d 150,642 N.E.2d 615, syllabus.
 {¶ 17} In the instant case, Ford argues that the trial court erred when it denied their summary judgment motion because the Bellmans could not have justifiably relied on any alleged false statements about a replacement dealer if Ottawa Ford failed. Specifically, Ford contends that the letter sent by Goellner to Bellman dated December 9, 1996 disclaimed any possibility that a replacement "operator" or dealer would be appointed if Robinson failed.
 {¶ 18} In Ohio, in order to prove fraud, a plaintiff must show:
(a) a representation or, where there is a duty to disclose,concealment of a fact, (b) which is material to the transactionat hand, (c) made falsely, with knowledge of its falsity, or withsuch utter disregard and recklessness as to whether it is true orfalse that knowledge may be inferred, (d) with the intent ofmisleading another into relying upon it, (e) justifiable relianceupon the representation or concealment, and (f) a resultinginjury proximately caused by the reliance.
 Cohen v. Lamko (1984), 10 Ohio St.3d 167, 169,462 N.E.2d 407. In defining justifiable reliance, Ohio courts have stated:
Although the plaintiff's reliance on the misrepresentationmust be justifiable . . . this does not mean that his conductmust conform to the standard of the reasonable man. Justificationis a matter of the qualities and characteristics of theparticular plaintiff, and the circumstances of the particularcase, rather than of the application of a community standard ofconduct to all cases.
See, Amerifirst Savings Bank of Xenia v. Krug (1999),136 Ohio App.3d 468, 496, 737 N.E.2d 68 quoting Field v. Mans
(1995), 516 U.S. 59, 70-71, 116 S.Ct. 437 citing Restatement of the Law, Torts (1976), Section 545A, Comment b.
 {¶ 19} A review of the record indicates that both Ford's lease agreement and Goellner's letter to Bellman demonstrate that Ford may not have any obligation to pay any lease payments not made by Ottawa Ford. Moreover, Goellner's letter also states that Ford was under no obligation to appoint a new "operator" if Robinson failed. On the other hand, however, both Goellner and Wolf consistently assured Eugene that the Dealer Development Program would be assisting three "operators" in an attempt to successfully run Ottawa Ford. Furthermore, Goellner's letter specifically states that Ottawa Ford will lease the facilities for ten years and the facility will meet Ford's standards for a Ford dealership. Goellner's letter also refers to a marketing study that indicates the Ottawa "is desirable for a Ford dealership and we advise you that we intend to have a dealer there for the ten-year period commencing December 9, 1996."
 {¶ 20} Based on the numerous alleged promises and statements made by different representatives of Ford and the events surrounding the negotiation of the Bellman Ford-Mercury sale versus the plain language of the lease agreement and Goellner's letter, we conclude that reasonable minds could differ as to whether the Bellmans could have justifiably relied on Ford's statements when deciding whether to sell Bellman Ford-Mercury. For example, the record indicates that Eugene persistently asked Ford for reassurances, which he allegedly received, that Ottawa Ford would maintain its business operation for at least ten years. Moreover, Eugene testified he informed his employees that despite the sale of Bellman Ford-Mercury, no one would lose their job. Conversely, Goellner's letter indicates that Ford may not be under any obligation to employ a new "operator" if Robinson failed to maintain the dealership. Accordingly, genuine issues of material fact exist in determining whether the Bellmans could have justifiably relied on Ford's promises in selling Bellman Ford-Mercury. Thus, Ford's assignment of error is overruled.
 The Bellman's First and Second Assignments of Error The trial court erred to the prejudice of appellant when itdenied appellants' motion for judgment notwithstanding theverdict.
 The trial court abused its discretion when it deniedappellant's motion for new trial, as the jury's damage award wasnot supported by the manifest weight of the evidence.
 {¶ 21} In both assignments of error, the Bellmans argue that the trial court erred in not granting their motion for judgment notwithstanding the verdict, or in the alternative, their motion for a new trial because the correct jury verdict should have been $651,566.14 instead of $90,000. The Bellmans contend that $651,566.14 is the amount of money due under the lease before Ford stopped making its payments. Conversely, Ford argues that $90,000 is an accurate reflection of the damages considering the amount of money the Bellmans received in re-leasing and selling the property.
 {¶ 22} An evaluation of a judgment notwithstanding the verdict (JNOV) is governed by Civ.R. 50(B), and the standard applied is the same as when evaluating a directed verdict motion.Nickell v. Gonzalez (1985), 17 Ohio St.3d 136, 137,477 N.E.2d 1145. As stated in Posin v. A.B.C. Motor Court Hotel (1976),45 Ohio St.2d 271, 275, 344 N.E.2d 334:
The evidence adduced at trial and the facts established byadmissions in the pleadings and in the record must be construedmost strongly in favor of the party against whom the [JNOV]motion is made, and, where there is substantial evidence tosupport his side of the case, upon which reasonable minds mayreach different conclusions, the motion must by denied. Neitherthe weight of the evidence nor the credibility of the witnessesis for the court's determination * * *.
However, motions for a directed verdict and motions for JNOV are not evaluated identically. When a court rules on a motion for JNOV, all of the evidence introduced at trial is available for the trial court's consideration. Osler v. Lorain (1986),28 Ohio St.3d 345, 347, 504 N.E.2d 19.
 {¶ 23} On the other hand, a trial court may grant a new trial if the judgment of the jury is not sustained by the weight of the evidence. Civ.R. 64(A)(6). When reviewing the jury's verdict, the trial court independently weighs the evidence and examines the credibility of the witnesses. See Osler, 28 Ohio St.3d at 351, citing Rohde v. Farmer (1970), 23 Ohio St.2d 82,202 NE2d 685, paragraph three of the syllabus. In its review, however, the trial court is only to determine whether the jury's verdict has shaped a manifest injustice and whether the verdict is against the manifest weight of the evidence. Id. If no such injustice is found, the trial court must deny the request for a new trial. Id.
 {¶ 24} A reviewing court can only reverse a trial court's order denying a motion for a new trial upon a finding of an abuse of discretion. Oakman v. Wise (May 25, 2000), 3rd Dist. No. 5-00-01, unreported. An "abuse of discretion" connotes more than an error in law or judgment; it implies that the attitude of the court is unreasonable, arbitrary, or unconscionable. Blakemorev. Blakemore (1983), 5 Ohio St.3d 217.
 {¶ 25} In rendering its instructions to the jury, the trial court stated:
If you decide that the Bellmans have proven by a preponderanceof the evidence all of the elements of fraud, then you mustdecide by a preponderance of the evidence what amount of moneywill reasonably compensate them for their actual damagesproximately and directly caused by the fraud.
 In this case the measure of damages, if any, is the value ofthe lease between [the] Bellmans and Ottawa Ford-Mercury,Incorporated minus any payments received by [the] Bellmans whichwould have been payable under the remaining terms of the lease.
Trial Tr. at p. 642.
 {¶ 26} A review of the record indicates that Ford made its last lease payment in April 1999, which ultimately left Ford with a total of $651,566.14 remaining in unpaid rent, repairs, maintenance, insurance, utilities, and taxes (all of which were the responsibility of Ford under the terms of the lease). Specifically, the record indicates that Ford has a total of $645,400.00 in unpaid rent remaining and $30,081.64 in unpaid repairs, maintenance, insurance, utilities, and taxes. Furthermore, the record indicates that the Bellmans received $23,915.50 in lease payments from subsequent tenants such as Putnam County Commissioners and Sky Bank.
 {¶ 27} Accordingly, the total amount due to the Bellmans under the remaining portion of the lease was $675,481.64. As noted above, the Bellmans released the property to other tenants for a total of $23,915.50, which could be reasonably deemed as mitigating damages. This leaves a total of $651,566.14 due to the Bellmans under the lease. Ford argues that the sale of the land, including $383,500 in proceeds and $160,000 in a tax deduction realized from the sale, should be further deducted in mitigation of damages under the lease; however, we note that the deduction of income from the sale of the land is inconsistent with the jury instruction, which states:
In this case the measure of damages, if any, is the value ofthe lease between Bellmans and Ottawa Ford-Mercury, Incorporatedminus any payments received by Bellmans which would have beenpayable under the remaining terms of the lease.
Trial Tr. at 642. Moreover, it is our conclusion that amounts realized from the sale of the land should not be included in tallying the damages owed to the Bellmans because the Bellmans could have sold the land after collecting all the lease payments owed to them from Ford — i.e. after Ford leased the property for ten years.
 {¶ 28} In sum, viewing the evidence presented at trial in a light most favorable to Ford, we conclude that there is not substantial evidence to support Ford's argument, upon which reasonable minds could differ as to the amount of damages. Specifically, reasonable minds could not differ, given the wording of the jury instructions, as to what constitutes "the value of the lease . . . minus any payments received . . . whichwould have been payable under the remaining terms of the lease." Id. (emphasis added).
 {¶ 29} Thus, given the evidence presented at trial coupled with the jury instruction, the only rational amount of damages the jury could have reached is $651,566.14. Moreover, there is no reasonable explanation as to how the jury reached their $90,000 award on the evidence and instructions before it.[7] SeePostin, 45 Ohio St.2d at 275. The first assignment of error is sustained.
 {¶ 30} We reach the same conclusion in reviewing the trial court's denial of the Bellmans' motion for a new trial.[8]
After reviewing the evidence associated with calculating damages in this case, we conclude that the award in this case was against the weight of the evidence and it would constitute a manifest injustice to award the Bellman's $90,000 when the evidence presented and instructions of law would only support an award of $651,566.14. See Rohde, 23 Ohio St.2d at paragraph three of the syllabus. Accordingly, the second assignment of error is sustained.
 The Bellman's Third Assignment of Error The trial court erred to the prejudice of appellant when itdenied appellant's motion for prejudgment interest.
 {¶ 31} Based on our analysis and disposition regarding the First and Second Assignments of Error, we do not need to discuss whether the Bellman's are entitled to prejudgment interest.
 {¶ 32} In conclusion, Ford's Assignment of Error is overruled. The Bellman's First and Second Assignments of Error are sustained, and this case is remanded back to the trial court for a new trial in accordance with this opinion.
Judgment Reversed and Cause Remanded.
 Bryant and Rogers, J.J., concur.
[1] Eugene testified at trial that he was required to sign the letter in order to negotiate the sale of his dealership to Ford. Trial Tr. at p. 103.
[2] The Dealer Development Division "is maintained by Ford to provide capital assistance for otherwise qualified applicants who lack the total funds necessary to establish or acquire a dealership without Ford's assistance." Aff. of Anthony Wolf.
[3] The Dealer Development Division hired Robinson as Ottawa Ford's first "operator."
[4] The investment was organized through Ford Motor Company.
[5] Eugene testified that the offer was "firm enough" in October to execute the option.
[6] Robinson was the sole "operator" of Ottawa Ford. The record indicates that no other "operators" were given the opportunity to run the dealership despite the Dealer Development Division's program to give three "operators" an opportunity to manage the dealership.
[7] We note that even if the jury could have reasonably found that the sale of the property as well as the tax incentive associated with the sale should have been part of the damages, then that would still leave a damages award of roughly $108,000, which is $18,000 more than the jury actually awarded the Bellmans.
[8] The Bellman's motion for a new trial was raised pursuant to Civ.R. 59(A)(6) and (7); however, in their appellate brief, the Bellmans suggest that a new trial should be granted pursuant to Civ.R. 59(A)(4), too. Because the Bellmans did not raise a Civ.R. 59(A)(4) motion in the trial court, we will not address it for the first time on appeal.