OPINION
{¶ 1} This case is before us on the appeal of Raymond and Peggy Kuhn from a jury verdict in favor of Charles and Timothy Kleptz. In support of the appeal, the Kuhns raise the following assignments of error:
 {¶ 2} "I. The trial court erred as a matter of law by overruling Appellant's motions for judgment notwithstanding the verdict and for a new trial.
 {¶ 3} "II. The trial court erred by overruling Appellants' motion for a new trial because of an improper jury inference.
 {¶ 4} "III. The trial court erred by overruling Appellants' motion for a new trial because the jury verdict was against the manifest weight of the evidence.
 {¶ 5} "IV. The trial court erred by granting a directed verdict against Appellants on their damages for loss of property."
 {¶ 6} After considering the record and applicable law, we find the assignments of error without merit. Accordingly, the judgment of the trial court will be affirmed.
 I {¶ 7} This litigation arises from a landlord-tenant dispute. After a jury trial, the jury rejected the Kuhns' claims for nuisance, conversion, trespass, and unreasonable entry. Instead, the jury found that the Kuhns had abandoned their rental property in June, 2001. The jury also awarded Charles Kleptz $2,050 in unpaid rent and $350 for property damage.
 {¶ 8} In the first assignment of error, the Kuhns claim that the trial court erred in overruling their motion for judgment notwithstanding the verdict and alternative motion for a new trial. In this regard, the Kuhns contend that Charles Kleptz failed to prove the affirmative defense of abandonment. We disagree.
 {¶ 9} When a motion for judgment notwithstanding the verdict (JNOV) is considered, the trial court does not weigh evidence, nor does it decide credibility. Posin v. A.B.C. Motor Court Hotel (1976), 45 Ohio St.2d 271,275, 344 N.E.2d 334. The trial court construes the evidence most strongly in favor of the non-movant, and should grant a JNOV only where there is no evidence "to prove an essential element of the plaintiff's cause of action." Harbin v. Ohi-Tec Mfg., Inc., Clark App. No. 2001 CA 70, 2002-Ohio-2923, 2002 WL 1332471, *3 (citations omitted).
 {¶ 10} Motions for new trial may be granted if the jury's judgment is not sustained by the weight of the evidence. When the trial court reviews a jury verdict, it "independently weighs the evidence and examines the credibility of the witnesses." Bellman v. Ford Motor Co., Putnam App. No. 12-04-11, 2005-Ohio-2777, at ¶ 23. In the review, the trial court decides only if the jury's verdict has caused manifest injustice and whether the verdict is against the weight of the evidence. Id. We then review the trial court's decision for abuse of discretion, which means that we decide whether the court acted arbitrarily, capriciously, or unreasonably. Id. at ¶ 24 (citations omitted).
 {¶ 11} The third assignment of error in this case is based on a claim that the jury's decision on abandonment was against the manifest weight of the evidence. Since this requires us to apply the standards a trial court would use in deciding if a new trial should be considered, we will consider the first and third assignments of error together.
 {¶ 12} In this case, the parties agree that abandonment is defined as an:
 {¶ 13} "`"absolute unequivocal relinquishment of a right or status without regard to self or any other person. It is a virtual throwing away without regard as to who may take over or carry on. It is a total discarding of what existed or went before; and evidence thereof must be direct, affirmative or reasonably beget the exclusive inference of throwing away. * * *"'" City of Toledo v. Rayford, Lucas App. No. L-97-1310, 1998 WL 230450, *5, quoting from Hamilton v. Harville (1989),63 Ohio App.3d 27, 577 N.E.2d 1125.
 {¶ 14} The testimony presented at trial indicates that the jury finding of abandonment was not against the manifest weight of the evidence, and that evidence existed to prove the elements of abandonment. Therefore, the trial court did not err in refusing to grant either the motion for JNOV or the motion for a new trial.
 {¶ 15} As a preliminary point, we note that the trial court and jury are normally in the best position to assess witness credibility, since they have the opportunity to view witnesses, "observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. Covert v. Covert, Adams App. No. 03CA778, 2004-Ohio-3534, at ¶ 17. However, in the present case, even the written record displays significant contradiction and inconsistency in the testimony of Raymond and Peggy Kuhn, such that a fact-finder would be justified in disregarding any testimony they gave.
 {¶ 16} According to the record, Raymond and Peggy Kuhn (Raymond and Peggy) saw an empty house located on Sweet Potato Ridge Road, and approached Timothy Kleptz (Tim) in February, 2000, about renting the property. Tim's father, Charles, owned the house, and it had been vacant for some time. Charles lived out of town and did not really want to rent the property, but Tim told his father that these people needed a break. Because Tim and his father did not need the money, rent was set at a nominal price of $250 per month. When the Kuhns asked for installation of a new kitchen floor, the rent was raised to $325 per month to cover the cost of the floor. There was no written lease agreement, and the Kuhns had very little contact with Tim after they moved in. Peggy took the rent money to Purity Foods, which was a company Tim owned, and received receipts from various company employees. Between April, 2000, when they moved in, and June, 2001, Peggy contacted Tim only once, when the basement flooded. Tim gave the Kuhns a sump pump and they pumped out the basement.
 {¶ 17} There was a factual dispute about whether the Kuhns paid rent as required. Peggy testified that she paid the rent payment most of the time and was behind on rent only once, in October, 2000. However, Peggy's credibility was challenged by many inconsistencies and outright contradictions in her testimony. Tim admitted that his records were lax, because the rent was nominal and was not a high priority. Tim testified that the Kuhns moved in during April, 2000, but did not make their first rent payment until June 19, 2000. Therefore, they were behind in rent from the beginning. They were also late with the rent every month.
 {¶ 18} In April or May, 2001, Tim received a telephone call from ShafStar Rent-a-Center, which had rented property to the Kuhns. Tim was told that the Kuhns had moved and were no longer living at the house. The Rent-A-Center was looking for information about its property. As a result of the call, Tim went out and looked at the property. He found a vandalized and destroyed farmhouse, and a yard overgrown with weeds. Tim did not do anything at that time because it appeared the Kuhns had skipped owing rent, and the place was trashed. He did not have time at that point to clean up the property.
 {¶ 19} Peggy paid rent on May 18, 2001, but Tim was unaware of that fact, because his employees were the ones who took rent payments and he was often out of town. However, when this rent payment was made, the Kuhns were already several months behind on rent, as they had not paid rent in February or March.
 {¶ 20} The Kuhns testified that the basement flooded a second time. They did not indicate the precise date that this occurred, but it was sometime before June 7, 2001, when the electricity to the house was disconnected. Peggy admitted that the electricity was scheduled for disconnection because the bill had not been paid. However, she claimed that they called DPL and told the company to disconnect the electricity because of the flood. The DPL records do not reflect this. Instead, the records indicate that the electricity was disconnected for nonpayment.
 {¶ 21} As we noted earlier, there were many inconsistencies in the testimony of both Raymond and Peggy Kuhn. In fact, there are too many contradictions to list. However, one example is that Raymond denied in his deposition that he was ever behind in payments to DPL. Raymond then admitted at trial that he was not telling the truth about this. Specifically, Raymond testified that while he and his wife were involved with the Sweet Potato Ridge property, they put the electricity under four different people's names instead of using their own names. The reason for this deception was that the Kuhns had a large unpaid DPL bill in their own names. At the time the electricity was shut off in June, 2001, the bill was in the name of Peggy's twelve-year-old daughter, Sarah Fuller.
 {¶ 22} When the electricity was disconnected, the water supply to the house was also cut, because the well used an electric pump. The Kuhns testified that they stayed overnight at a relative's house from June 7 until June 16, when they left to vacation in Florida at a condominium that a friend had loaned them. Allegedly, during this time period, they showered at the relative's house and returned to the Sweet Potato Ridge property each day, to spend all day there, without electricity or water. Frankly, this was unbelievable, as was the claim that the Kuhns went to the property every day to feed and water two dogs they had left. As will be demonstrated, the dogs were found in a deplorable state of neglect.
 {¶ 23} On June 12, Duane Heucker went out to the property to mow the grass. Heucker had known Tim for years and did odd jobs for him. The yard was overgrown with waist-high grass, and there were belongings or junk in the yard. The front storm door was not there or was broken out. The property was abandoned. While Duane was mowing, the Kuhns drove in and asked him what he was doing. Duane told them that he worked for Tim. The Kuhns said they were not living there, and were living with their sister. They also said the basement was flooded and that they were going to Florida to look for a job. Duane told the Kuhns that Tim had said the place was vacated and that ShafStar had called to get their computer back.
 {¶ 24} Two dogs had been left at the property, and looked as if they had not been given water recently. The dogs' hair was also very matted. Duane had fed the dogs on a prior visit to the property because he thought the place was abandoned.
 {¶ 25} The Kuhns asked Duane to store their things for thirty days. Duane subsequently told Tim about the conversation he had with the Kuhns. From what Duane reported and the condition of the house, Tim concluded that the property had been abandoned. Between June 12, and when the Kuhns left for Florida on June 16, they did not contact Tim to indicate that they were on vacation, intended to return, or had not abandoned the house. In fact, they never contacted Tim thereafter about the house.
 {¶ 26} Previously, Duane had visited the property with his friend, Todd Chapman. Todd and Duane worked together at Precision Electric, and had a number of conversations about the property. Because Todd was looking for a house in the country, the two men went to the property in May, 2001. Todd observed a lot of trash everywhere, and very tall grass. There were broken windows and wires hanging out of windows. The house looked really bad from the outside. Todd and Duane went inside and found clothes and trash scattered everywhere. Dog feces were on the floor and had been stepped in. Food was rotting in the kitchen and the kitchen smelled very bad. The front door was unlocked and anyone could have walked in.
 {¶ 27} Todd went back on June 17, 2001, with his girlfriend, and took a video. The outside was similar to what he had seen on his previous visit. The condition inside was about the same, with trash and feces still on the floor. The house looked like it had been ransacked. Again, the kitchen smelled very bad and there was no electricity. At this point, the basement was also flooded and paint was chipping off from moisture. Todd saw a fish tank with big dead fish in it that smelled really bad. Todd testified that he could smell the basement water in some of the rooms, but in the kitchen and room with the fish tank, the basement smell was overwhelmed by the odor of rotting food and dead fish.
 {¶ 28} Todd found at least twenty-one broken panes of glass in the house. In addition, he found human waste in the bathroom, and said the bathtub looked as if it had never been cleaned. Todd videotaped the four bedrooms, showing all the clothes, trash, and graffiti. According to Todd, the house looked as if it had been stripped of all items of value.
 {¶ 29} Tim also went out to the property with Duane in June, 2001. On this visit, Tim saw water in the basement, up to ground level, and decided that the property had to be cleaned up. Consequently, Duane, Todd, and some other individuals went to the property on June 21, 2001, to clean. At that time, the water was pumped out of the basement. The men also removed items and stored them in a summer house located on the property.
 {¶ 30} Ironically, on the same day, a friend of the Kuhns (Janice Hansford) stopped by the house to get the mail. Janice had loaned the Kuhns a time-share to use while they were in Florida. When Janice saw that the kitchen was empty, and that there were piles of belongings in the storage shed, she went home and called Peggy to see if they were, in fact, moving to Florida. Janice testified that the Kuhns had said they were going down to Florida to seek a job opportunity. They were not going to Florida for a vacation. While Janice was on the phone, Peggy said the police were at the house, and asked Janice to go back.
 {¶ 31} Officer Combs of the Clayton Police Department testified about being called to the property on June 21, 2001. The police were called because someone had information on possible stolen property and narcotics (a 35 millimeter film canister with white powder) left there by previous renters. Todd found these items on the property and asked Duane to call the police. After investigating, Combs determined that the property in question (a U-Haul dolly) was not stolen. The cannister did not have a substantial amount inside, and Combs did not test it.
 {¶ 32} Combs indicated that he had vivid recollection of the state of the property on June 21, 2001. The basement was extremely dark, flooded, and stinky. The house looked like it had been aggressively lived in. The living conditions were about as bad as he had seen. The best way to describe the house was that if someone left, the stuff that remained would be what someone would leave. Combs indicated that "* * * it looked as if the renters had basically taken whatever of value there was and basically left the property." What was left of the property in terms of possessions was basically within the filth that he found in the interior of the property.
 {¶ 33} When Combs arrived, the people who were there cleaning were in the process of moving some of the possession from the main house into the spring house. No one said that they were allowed to take any of the items they wanted. Combs did not see anything of value in the residence or the storage building.
 {¶ 34} Combs also found a couple of dead animals on the property. There was a dead dog wrapped in a small towel or blanket that looked as if it had been decomposing for longer than four days (or in other words, before the Kuhns left). In addition, there were two highly neglected dogs that were in pretty bad shape. Combs spoke to the former renters (the Kuhns) by phone and questioned them aggressively about why the two dogs were on the property in that condition. They claimed that someone else was supposed to be taking care of the animals.
 {¶ 35} During his conversation with the Kuhns, Combs learned that there was a distinct difference of opinion about the status of the property. One party told him they were cleaning the house out because it had been abandoned and the other side said they were on vacation. Accordingly, Combs decided it was a civil matter and told the gentlemen cleaning the house to leave the status quo until the matter could be resolved.
 {¶ 36} At that point, Duane and Todd left the property, and nothing more was done. Around June 27, 2001, the Kuhns returned to Ohio. The next day, they went to the Sweet Potato Ridge Road property. According to the Kuhns, various items of property were missing or broken, including furniture, televisions, electronic items, collectibles, dishes, and tools. Both Raymond and Peggy subsequently saw the video that Todd Chapman made on June 17, 2001. They said that they had last been at the property on June 15, 2001. They both denied that they had left the property in the condition shown in the video. Peggy testified that they went back to the house on June 15, 2001, before leaving for Florida, to make sure there was no trash in the house, to make sure that they had taken care of the dogs, and to make sure that everything was the way it should be when someone leaves on vacation. Both Peggy and Raymond also denied that they looked for jobs while in Florida. They claimed, instead, that they were on a family vacation. There was substantial evidence contradicting this testimony, and indicating that the Kuhns did look for jobs in Florida.
 {¶ 37} By finding that the Kuhns abandoned the property in June, 2001, the jury clearly chose to disbelieve the testimony of Raymond and Peggy Kuhns. In arguing that the verdict was against the weight of the evidence, the Kuhns contend that the only evidence about abandonment came from Tim Kleptz, who testified that the property was abandoned in April or May. Allegedly, this testimony conflicts with a letter Tim wrote indicating that the Kuhns had until July 15, 2001 to "totally vacate." We find no significant conflict.
 {¶ 38} In the first place, Tim Kleptz did not testify that the date of abandonment was in April or May. In this regard, Tim simply said that he was informed in April or May by Shafstar that the Kuhns were no longer living at the property. When Tim investigated, his impression was that the renters had skipped, owing rent. His impression of abandonment was confirmed in June by what he saw at the property and by what Duane told him.
 {¶ 39} The letter in question (Joint Exhibit I) is not inconsistent with these facts. The letter indicates that Raymond Kuhn told Duane on June 12, 2001, that the family was moving to Florida and needed more time to find a place for their things. Kuhn asked for thirty days, and was told that he had until July 15, 2001 to "totally vacate." None of this is inconsistent with the conclusion that the rental property had been abandoned. Under the circumstances, the landlord reasonably concluded that the renters had abandoned the premises. In point of fact, the premises was uninhabitable. Furthermore, in view of the deplorable condition of the personal property left on the premises, a landlord could also have reasonably concluded that the tenants had taken anything of value and had abandoned the rest. This was actually the conclusion of the police officer who visited the premises two days after the Kuhns left for Florida, as well as others who saw the premises after the Kuhns left.
 {¶ 40} This inference is further supported by the fact that the Kuhns returned their computer to Shafstar Rent-A-Center before they left for Florida. There is no logical reason (and the Kuhns offered none) why the computer would have been returned if the Kuhns only intended to vacation for a short time. Admittedly, the computer could have been returned for other reasons, but the Kuhns did not offer any such explanations. Again, a reasonable inference from the facts is that the Kuhns left for Florida after having removed any property of value from the premises.
 {¶ 41} Accordingly, the jury verdict was not against the manifest weight of the evidence, and the trial court did not err in denying the motion for judgment notwithstanding the verdict and alternative motion for new trial. The first and third assignments of error, therefore, are without merit and are overruled.
 II {¶ 42} In the second assignment of error, the Kuhns contend that the trial court should have granted their motion for new trial due to an improper jury interrogatory. Interrogatory No. 1 asked the jury whether it found that Raymond and Peggy Kuhn had abandoned the property at 4735 Sweet Potato Ridge Road in June, 2001. After the jury was given instructions, the Kuhns objected to this interrogatory because the defense allegedly was that the property had been abandoned in April or May, 2001. The judge did not change the interrogatory, and declined to ask the jury to specify when the abandonment occurred.
 {¶ 43} Civ. R. 49(B) provides that:
 {¶ 44} "[t]he court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."
 {¶ 45} We have stressed that Civ. R. 49 does not require the court to act as a mere conduit. Furthermore, the court has limited discretion to reject interrogatories that are "ambiguous, redundant, confusing, or otherwise legally objectionable." Phillips v. Dayton Power Light Co.
(1996), 111 Ohio App.3d 433, 440, 676 N.E.2d 565. "Determinative issues" have been defined as:
 {¶ 46} "`"ultimate issues which when decided will definitely settle the controversy between or among the parties, so as to leave nothing for the court to do but to enter judgment for the party or parties in whose favor such determinative issues have been resolved by the jury."'" Id.
 {¶ 47} As we mentioned earlier, the evidence indicates that the Kuhns abandoned the Sweet Potato Ridge property in June, 2001. Although Tim did think in April or May, 2001, that the property had been abandoned, his belief was confirmed by the events that occurred in June, 2001. More important, however, is the fact that the Kuhns did not abandon the property in May. They paid rent in May (although admittedly late), and the basement flood and electricity disconnection did not take place until June 7. The Kuhns did not pay rent in June, nor did they contact Tim to indicate that they had not abandoned the rental premises. In our opinion, giving the jury an interrogatory on abandonment in April or May, 2001, would have been both incorrect and confusing. Accordingly, the trial court did not err when it gave the jury an interrogatory focusing on the events of June, 2001.
 {¶ 48} Based on the preceding discussion, the second assignment of error is without merit and is overruled.
 IV {¶ 49} In the fourth assignment of error, the Kuhns challenge the trial court's decision to grant a directed verdict on their damages for loss of personal property. At the end of the Kuhns' case, the court found that the Kuhns had failed to testify about the fair market value of the property they claimed to have lost, and had instead testified about replacement cost. Consequently, the court refused to admit exhibits regarding replacement cost, and also granted a directed verdict regarding the measure of damages that would be submitted to the jury. At the end of the trial, the court instructed the jury about the four claims that the Kuhns had asserted, i.e., violation of Ohio landlord tenant law, trespass, conversion, and nuisance. The court then told the jury that the Kuhns had failed to present a fair market valuation of property and that replacement cost of personal property was an improper measure of damages. The court did tell the jury that it could award nominal damages, as well as compensatory damages for lost earnings. In addition, the court said that if the jury awarded either nominal or compensatory damages, it could award punitive damages.
 {¶ 50} During deliberation, the jury answered a set of interrogatories and general verdict forms. The jury answered "yes" to Interrogatory Nos. 1, 8, and 9. The jury thus found that the Kuhns had abandoned the property in June, 2001, and that they owed Charles Kleptz $2,050 in rent and $350 for property damage. The jury also signed general verdict forms finding for the Defendants on Plaintiffs' claims, and also finding in favor of Defendants against Plaintiffs, in the total amount of $2,375.
 {¶ 51} Interrogatory Nos. 2 through 5 related to the Plaintiff's theories of liability. For example, Interrogatory No. 4 asked the jury to find whether Timothy Kleptz had committed conversion of the Plaintiff's personal property at Sweet Potato Ridge Road. Similarly, Interrogatory No. 5 asked if Timothy Kleptz intentionally created a nuisance to Plaintiffs by damaging or removing their personal property. Interrogatory No. 6 then instructed the jury to specify nominal and compensatory damages that should be awarded, if the jury had answered "yes" to any or all of Interrogatory Nos. 2 through 5. The jury left Interrogatory Nos. 2 though 5 blank, and, therefore, did not reach the question of what damages should be awarded to the Kuhns.
 {¶ 52} In view of the jury verdict, we need not consider the damages issue in detail. Even if we assume that the trial court erred in directing a verdict on the proper measure of damages, any error would have been harmless, since the jury did not find in favor of the Kuhns on their liability claims. Compare Aziz v. Ditty, Franklin App. No. 01AP-1057, 2002-Ohio-2234, at ¶ 42 (holding that even if the trial court had erred in granting a directed verdict on the issue of plaintiff's negligence, the error was harmless, since the jury decided that the defendant was not negligent. Consequently, there was no reason to compare the negligence of the plaintiff and the defendant). See, also, Petro v.Cuyahoga Cty. Bd. Of Commrs., Cuyahoga App. No. 81358, 2003-Ohio-2188, 2003 WL 1995304, *5 (trial court's use of evidence outside record in granting directed verdict for defendant was harmless error, where plaintiff failed to establish prima facie case of discrimination).
 {¶ 53} Because the alleged error on damages would have been harmless, the fourth assignment of error is without merit and is overruled.
 {¶ 54} In light of the preceding discussion, assignments of error one, two, three, and four are overruled, and the judgment of the trial court is affirmed.
Fain, J., and Donovan, J., concur.