DECISION AND JOURNAL ENTRY
{¶ 1} Commercial Union Insurance Company ("Commercial Union") and a group of London Market Insurers: Accident Casualty Company; Commercial Union Assurance Company; Edinburgh Assurance Company; United Scottish Insurance Company, Ltd.; Victoria Insurance Company, Ltd.; Road Transport, GP AV; Winterthur Swiss Insurance Company; World Auxiliary Insurance Corporation Limited; and Yasuda Fire Marine Insurance Company (U.K.) Limited (collectively referred to as "the London Market Insurers")[1], separately appeal from a judgment of the Summit County Court of Common Pleas entered against them in favor of Goodrich Corporation ("Goodrich"). Goodrich cross-appeals from the judgment. This Court affirms in part and reverses in part. *Page 2 
 I. {¶ 2} This action commenced in 1999, when Goodrich filed a complaint against several insurance carriers with whom it had held excess general commercial liability insurance policies from 1955 through 1986. Goodrich had already settled its coverage dispute with its primary insurance carrier and had exhausted its $20 million in primary insurance coverage. Goodrich's excess insurance policies attached at coverage levels of $20 million and higher.
 {¶ 3} Goodrich's principal claims were for breach of contract and bad faith. The litigation focused on whether the insurers were contractually obligated to indemnify Goodrich against claims filed by the government under the Comprehensive Environmental Response, Compensation, and Liability Act and the Resource Conservation and Recovery Act. Goodrich's environmental cleanup costs stemmed from soil and groundwater contamination caused by Goodrich's manufacturing and waste water disposal practices from approximately 1963 to 1983 at its plant in Calvert City, Kentucky. The sole contaminant at issue in this litigation was ethylene dichloride ("EDC"), a chemical used in Goodrich's production of vinyl chloride monomer.
 {¶ 4} Experts had opined that there were four main sources of the EDC groundwater contamination at Calvert City: (1) the burn pits (Goodrich disposed of oily EDC waste water by burning it in open pits during the early 1960s until 1967); (2) the landfill (during the mid-1960s until 1973, Goodrich also disposed of EDC in a landfill at Calvert City); (3) the process areas (periodic pipe ruptures and equipment malfunctions caused EDC to accidentally spill into the environment); and (4) the settling ponds (during much of this period, EDC waste was placed in large ponds and allowed to settle, evaporate, and dissipate in a process akin to a septic system). *Page 3 
 {¶ 5} Although this case proceeded to trial against numerous defendant insurers, by the time the trial ended, Goodrich had settled with most of its excess insurers. The jury ultimately decided Goodrich's claims against four insurers or insurer groups: Commercial Union on claims of bad faith and breach of contract, and the London Market Insurers, California Union Insurance Company, and Insurance Company of North America on claims of breach of contract. The jury's general verdicts were for Goodrich against Commercial Union and the London Market Insurers on all claims, and for California Union Insurance Company and Insurance Company of North America against Goodrich. On the breach of contract claims, the jury found that Goodrich had sustained $42 million in damages, including two million dollars in litigation expenses on the underlying actions by the government. The jury also found that Goodrich was entitled to recover its attorney fees in this case on both the breach of contract claims and the bad faith claim. As instructed by the trial court, the jury did not calculate a dollar award for attorney fees but left that determination for the trial court.
 {¶ 6} Commercial Union, the London Market Insurers, and Goodrich all filed motions for judgment notwithstanding the verdict on various grounds, and the trial court later denied all of those motions. The trial court decided many issues through post-trial proceedings. These issues included Goodrich's attorney fees, prejudgment interest, whether the damage judgment against the defendants would be reduced due to Goodrich's prior settlements with other insurers, and whether Goodrich would incur future cleanup costs.
 {¶ 7} The trial court ordered the appellants to pay Goodrich over $22 million in attorney fees and other litigation costs, with Commercial Union being held liable for a greater portion of those costs due to Goodrich's bad faith judgment and separate attorney fee award against it. The trial court awarded Goodrich over $20 million in prejudgment interest against *Page 4 
Commercial Union only. The trial court also determined that the damage judgment against Commercial Union and the London Market Insurers would be reduced by $20 million received from the primary insurer because liability under the excess policies did not attach until Goodrich's damages had reached $20 million. Despite their requests and arguments to the contrary, the trial court did not allow Commercial Union and the London Market Insurers any further reduction of the damage award due to settlement money received by Goodrich. The trial court also declared that Commercial Union and the London Market Insurers are contractually obligated to Goodrich for remediation and defense costs at the Calvert City site incurred after September 30, 2005, the damage cutoff date for trial.
 {¶ 8} Commercial Union and the London Market Insurers filed separate appeals, which this Court later consolidated. Goodrich cross-appealed against each of the appellants as well as against the remaining defendants. Goodrich filed two briefs in its cross-appeal, assigning slightly different cross-assignments of error against Commercial Union and the London Market Insurers. For ease of discussion, the assignments and cross-assignments of error will be rearranged and, to the extent the assigned errors are identical or related to other assignments of error or cross-assignments of error, they will be consolidated.
 II. Bad Faith COMMERCIAL UNION'S ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED WHEN IT DENIED CU'S MOTIONS FOR DIRECTED VERDICT AND [JUDGMENT NOTWITHSTANDING THE VERDICT] ON [GOODRICH'S] `BAD FAITH' [CLAIMS]." *Page 5 
 CROSS-ASSIGNMENT OF ERROR I AGAINST LONDON "THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT TO LONDON MARKET RELATING TO GOODRICH'S BAD FAITH CLAIM."
 {¶ 9} Goodrich had alleged bad faith claims against both Commercial Union and the London Market Insurers and presented evidence at trial on each of these claims. Each insurer filed a motion for directed verdict on the bad faith claim against it at trial. The trial court granted a directed verdict to the London Market Insurers on Goodrich's bad faith claim, but denied the directed verdict motion of Commercial Union. The jury ultimately found for Goodrich on its bad faith claim against Commercial Union. Commercial Union moved for a judgment notwithstanding the verdict on the bad faith claim, which the trial court denied.
 {¶ 10} Through its first assignment of error, Commercial Union contends that the trial court erred when it overruled its motions for directed verdict and judgment notwithstanding the verdict on Goodrich's bad faith claim. Through its first cross-assignment of error against the London Market Insurers, Goodrich contends that the trial court erred in granting the London Market Insurers a directed verdict on the bad faith claim. This Court will address each bad faith claim in turn.
 {¶ 11} This Court begins by emphasizing that a motion for judgment notwithstanding the verdict under Civ.R. 50(B) is reviewed under the same standard as a motion for a directed verdict under Civ.R. 50(A).Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998),81 Ohio St.3d 677, 679. On appeal, this Court reviews de novo and applies the same standard as the trial court. Goodyear Tire Rubber Co. v. AetnaCas. Sur. Co., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 4. Pursuant to Civ.R. 50(A)(4), a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the nonmoving party, "reasonable minds could *Page 6 
come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party."
 {¶ 12} The standard to determine whether an insurer acted in bad faith was set forth in Zoppo v. Homestead Ins. Co. (1994), 71 Ohio St.3d 552, paragraph one of the syllabus:
 "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor."
 {¶ 13} As the Court emphasized in Zoppo, an insurer has an "affirmative duty to conduct an adequate investigation." Id. at 558. Consequently, the circumstances that would provide a "reasonable justification" for an insurer's denial of coverage would necessarily include a full investigation of the insured's alleged claim.
 Commercial Union {¶ 14} The evidence at trial established that Goodrich first provided notice to Commercial Union about potential environmental cleanup claims at its Calvert City site in June 1989. The notice included cleanup cost estimates at that time of over $17 million. Commercial Union responded by informing Goodrich that it believed the notice was premature, but it requested more information. Goodrich responded by sending more information and periodic updates over the next several years. Commercial Union did no follow-up investigation into the potential merit or extent of the Calvert City environmental claim at that time. Goodrich eventually gathered 20 file drawers of documents at its Calvert City site, which it made available to its insurers, but Commercial Union did not ask to inspect any of those documents until many years later. Goodrich received no further communications from Commercial Union until 1995.
 {¶ 15} In March, 1995, Goodrich informed Commercial Union that it was nearing a settlement with its primary insurance carrier and that coverage under the primary policy would *Page 7 
be exhausted. Through a letter dated September 14, 1995, following other correspondence between the parties, Commercial Union indicated to Goodrich that it would investigate the claim under a full reservation of rights. Through a letter dated October 6, 1995, Goodrich indicated that, among other things, its underlying policy coverage had been exhausted and that the majority of the claim documentation was at the Calvert City site. Goodrich and Commercial Union spent many months corresponding back and forth to work out the details for Commercial Union to review the documentation.
 {¶ 16} During March of 1997, Goodrich sent a coverage demand letter to Commercial Union for over $70 million for Calvert City cleanup costs. Commercial Union responded with a denial of coverage because Goodrich had failed to establish that it had exhausted its underlying insurance coverage. Additional correspondence went back and forth between Goodrich and Commercial Union over the next several months, including a letter from Commercial Union that it had a new claims handler who would need to become familiar with the case.
 {¶ 17} During September, 1997, the parties met at Goodrich's corporate headquarters in Richfield, Ohio and, later that month, Commercial Union came to Calvert City to inspect the relevant documents. Goodrich provided Commercial Union with copies of many documents and arranged for a meeting in December 1997 to discuss Goodrich's settlement demand, which it had sent to Commercial Union several months earlier. Goodrich indicated to Commercial Union that it expected a response to its settlement demand at the December meeting. Commercial Union never asked to postpone the December meeting, nor did it ever indicate that it would not be prepared by that time to respond to the settlement demand. At the December meeting, however, Commercial Union again indicated that it was not prepared to respond and did not know when it would be because it needed more information. *Page 8 
 {¶ 18} Goodrich first gave notice to Commercial Union in 1989, and continued to send periodic information to Commercial Union over the next several years. After receiving notice from Goodrich, Commercial Union did no fact investigation, nor did it review any of Goodrich's primary insurance policies in connection with the Calvert City notice. It was not until six years later that Commercial Union started corresponding with Goodrich about the claim, and it continued to deny liability without inspecting the Calvert City documentation.
 {¶ 19} Construing this evidence in favor of Commercial Union, the circumstances under which it denied coverage to Goodrich did not include any investigation of the Calvert City claims. Although Commercial Union purported to have defenses to Goodrich's claims, it had not reviewed any of the relevant facts to determine what Goodrich's claims were. From the evidence presented at trial, reasonable minds could have concluded that Commercial Union refused to indemnify Goodrich for its Calvert City cleanup costs under circumstances that did not provide reasonable justification.
 {¶ 20} Commercial Union also raises a legal argument that the bad faith claim must fail because the jury found that Goodrich had incurred no damages. It is true that, on the general verdict form, the jury found for Goodrich and against Commercial Union on the bad faith claim but awarded $0.00 in compensatory damages. The parties had also submitted a series of interrogatories to the jury on this claim, however, and the jury's answer to those interrogatories demonstrate that the jury did award Goodrich compensatory damages on the bad faith claim. Although the jury failed to quantify a dollar amount of compensatory damages on this claim, a further reading of the jury instructions and jury interrogatories indicates that the jury awarded attorney fees as a component of compensatory damages but, as it had been instructed, left the amount of attorney fees to be determined later by the trial judge. *Page 9 
 {¶ 21} Without any objection on the record from Commercial Union, the trial court instructed the jury that it could award attorney fees as a component of compensatory damages on the bad faith claim:
 "If you find bad faith, you will consider what damages will compensate the insured. You may award attorney fees as compensatory damages or any other damages you find are caused by the bad faith of the insurer.
 "If you decide that Commercial Union is liable for attorney fees, the court will determine the amount."
 {¶ 22} The jury also answered specific jury interrogatories about damages on the bad faith claim against Commercial Union. Jury Interrogatory Question Number 3 asked the jury whether Goodrich had proved compensatory damages arising out of bad faith, to which the jury answered, "Yes." Question Number 4 further asked the jury:
 "Are attorneys' fees to be included in compensatory damages? If the answer is `yes,' you shall not determine an amount for such fees or include any such amount in any other determination of damages."
The jury answered "Yes" to Question Number 4. Question Number 5 asked the jury:
 "What is the amount of compensatory damages? If your answer to Question 4 was `yes,' do not include attorney fees in your determination of these damages."
The jury responded to Question 5 with an answer of "$0.00."
 {¶ 23} A full reading of these interrogatory answers indicates that the jury did find compensatory damages on the bad faith claim, but did not quantify the damages because it had been instructed not to do so. It is apparent from the jury's answers to its interrogatories that it found that attorney fees would be awarded as compensatory damages for the bad faith claim but that no additional compensatory damages were warranted. The jury's answers were clear and unambiguous and can be interpreted no other way. As the trial court commented during a discussion with the parties about the jury's verdicts and answers to the interrogatories, "the proof of [bad faith] compensatory damages is the attorney fees." *Page 10 
 {¶ 24} Because Commercial Union has failed to demonstrate that the trial court erred in failing to grant a directed verdict or judgment notwithstanding the verdict on Goodrich's claim against it for bad faith, Commercial Union's first assignment of error is overruled.
 London Market Insurers {¶ 25} The trial court granted the London Market Insurers a directed verdict on Goodrich's bad faith claim. Goodrich challenges that determination through its first cross-assignment of error against the London Market Insurers.
 {¶ 26} Unlike Goodrich's evidence against Commercial Union, its evidence pertaining to its negotiations with the London Market Insurers failed to demonstrate an unjustified refusal to pay Goodrich's claim. Although Goodrich presented extensive evidence pertaining to its bad faith claim against Commercial Union, it presented much less evidence about its claims negotiations with the London Market Insurers. Moreover, the facts pertaining to Goodrich's bad faith claim against the London Market Insurers were markedly different from those pertaining to Commercial Union.
 {¶ 27} Goodrich's insurance claim against Commercial Union was relatively straightforward: it involved only one insurance company, a total of three insurance policies, and was limited to the Calvert City site. Goodrich's claims negotiations with the London Market Insurers, on the other hand, were much more complicated because the insurer was actually a group of several insurance companies; numerous insurance policies covering a more extended period of time were at issue; and the negotiations involved several Goodrich cleanup sites in addition to Calvert City.
 {¶ 28} During 1989, Goodrich sent notice about its environmental liability at Calvert City to some of the London Market Insurers through their brokers. At that time, Goodrich *Page 11 
believed that the relevant disposal period had begun in 1963, so it notified only those insurers with whom it held policies during 1965 and later. Goodrich later came to believe that the relevant EDC disposal period began before 1963 and, after locating pre-1963 London Market policies, notified additional London Market Insurers in 1991.
 {¶ 29} Unlike Commercial Union, the London Market Insurers conducted an ongoing investigation of Goodrich's claim shortly after receiving notice. Those London Market Insurers who received notice from Goodrich in 1989 promptly responded with a reservation of rights letter. The insurers who were notified in 1991 likewise promptly responded with another reservation of rights letter. Through these letters, the London Market Insurers asked to review the documentation at the Calvert City site, which they did. Goodrich and the London Market Insurers had ongoing negotiations over the next decade.
 {¶ 30} In addition to the numerous insurers and policies involved, Goodrich's coverage negotiations with the London Market Insurers were further complicated by the fact that negotiations were not confined to Goodrich's liability at the Calvert City site. Goodrich's initial notice to the London Market Insurers involved Goodrich's potential environmental liability at over 30 cleanup sites. Coverage negotiations over the next decade continued to involve multiple environmental sites.
 {¶ 31} In March 1996, Goodrich indicated that it thought it could make a settlement demand, but by June 1996, Goodrich was still evaluating its position in regard to the London Market Insurers and was still contemplating settling its multiple liability claims. As Goodrich's claims representative testified, "it was different for London. It was a broader demand. It was Calvert City and a host of these long-tail liability claims." *Page 12 
 {¶ 32} During March, 1997, Goodrich made a settlement demand to the London Market Insurers, but that demand involved the Calvert City site as well as several other Goodrich environmental cleanup sites. There was no evidence that Goodrich ever made a specific demand for coverage at only the Calvert City site, and, more significantly, the London Market Insurers never issued Goodrich a denial of coverage.
 {¶ 33} From the evidence presented at trial, construed in favor of Goodrich, reasonable minds could not conclude that London Market Insurers unjustifiably refused to pay Goodrich's claim. Therefore, the trial court did not err in granting the London Market Insurers a directed verdict on Goodrich's bad faith claim.
 {¶ 34} Commercial Union's first assignment of error and Goodrich's first cross-assignment of error against the London Market Insurers are overruled.
 Settlement Setoffs COMMERCIAL UNION'S ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED WHEN IT DENIED CU'S MOTION FOR APPLICATION OF CREDITS AND SETTLEMENT SETOFFS."
 LONDON MARKET'S ASSIGNMENT OF ERROR IV "THE TRIAL COURT ERRED WHEN IT DENIED CERTAIN LONDON MARKET [INSURERS'] MOTION FOR APPLICATION OF CREDITS AND SETTLEMENT SET-OFFS."
 LONDON MARKET'S ASSIGNMENT OF ERROR V "THE TRIAL COURT ERRED BY DENYING CERTAIN LONDON MARKET [INSURERS] SET-OFFS FOR AMOUNTS PAID BY OTHER LONDON MARKET SUBSCRIBERS."
 {¶ 35} Through Commercial Union's second assignment of error and the London Market Insurers' fourth and fifth assignments of error, the appellants contend that the trial court erred in failing to offset the damages awarded against them by the amounts paid by the insurers who had *Page 13 
already entered into monetary settlements with Goodrich. After the trial concluded, both appellants moved for a damage setoff due to the $55.8 million in settlement money that Goodrich had received from its other insurers. The trial court did allow a $20 million setoff against the $42 million damage judgment because the excess policies did not attach until the primary insurance coverage of $20 million had been exhausted. Aside from the $20 million setoff, however, the trial court denied Commercial Union and the London Market Insurers any further credit for Goodrich's recovery through settlements with its other insurers.
 {¶ 36} Because Goodrich had already received $55.8 million from the settling insurers for its claims at the Calvert City site, the appellants contend that Goodrich's settlement recovery should completely offset the $42 million judgment against Commercial Union and the London Market Insurers, or Goodrich will be overcompensated for its actual damages.
 {¶ 37} There is little Ohio law on the issue of settlement credits and none that addresses many of the issues raised by the parties here, such as whether a non-settling insurer should be entitled to settlement credit, and if so, how should equitable principles and public policy factor into that determination. Relying on case law from other jurisdictions, the parties dispute many facets of the law pertaining to allocation of settlement credits. This Court need not delve into undefined areas of Ohio law, however, as this issue can be resolved by applying undisputed principles of law.
 {¶ 38} "Setoff of settlement funds has been recognized as a means to protect against the danger of a double recovery" in cases where a plaintiff has received monetary settlements from other defendants or potential defendants. Celmer v. Rodgers, 11th Dist. No. 2004-T-0083,2005-Ohio-7055, at ¶ 27. The parties do not dispute that the basis for granting a defendant credit for the settlement money that the plaintiff has received from other defendants is the notion that a *Page 14 
plaintiff should not receive more than one recovery for the same damages. As the trial court stated in its ruling, "[a]pplication of a settlement credit assumes that the compensation paid by each defendant is for the same damages." Where no potential for double recovery by the plaintiff has been demonstrated, however, setoff should not be permitted. Howard v. Seidler (1996), 116 Ohio App.3d 800, 816.
 {¶ 39} It has been held in other jurisdictions that, "because [settlement] credit is in the nature of an affirmative defense on the issue of damages, the defendant who seeks to take advantage of this credit bears the burden of proving the amount of credit to which he is entitled." Riehle v. Moore (Ind.App.1992), 601 N.E.2d 365, 371; see, also, Weyerhaeuser Co. v. Commercial Union Ins. Co. (2001), 15 P.3d 115. Ohio courts agree that the "burden of proving mitigation of damages is upon the party claiming the mitigation." See, e.g., Capital Equip.Ents., Inc. v. Wilson Concepts, Inc. (1984), 19 Ohio App.3d 233, 234.
 {¶ 40} Commercial Union and the London Market Insurers failed to demonstrate that Goodrich would receive a double recovery for the same damages; therefore, the trial court properly denied any credit against the judgment for settlements Goodrich received beyond $20 million received from the primary insurer.
 {¶ 41} Because all of the settlements at issue involved insurance coverage disputes over Goodrich's environmental liability at its Calvert City site, Commercial Union and the London Market Insurers seemed to presume that the damages were the "same" and sought a dollar for dollar setoff against the damages awarded by the jury. Aside from a jury interrogatory that specified that $2 million of the judgment was for underlying litigation expenses, the jury did not indicate what specific damages were included in its $40 million figure. As the litigation had focused solely on Goodrich's past EDC remediation costs at Calvert City, the damages awarded *Page 15 
obviously were for EDC cleanup costs, although it is uncertain which of the claimed costs the jury awarded.
 {¶ 42} The record fails to even suggest that any of Goodrich's negotiated settlements with its other insurers was intended to merely compensate Goodrich for its past cleanup costs at Calvert City. In fact, although there is nothing that breaks down or quantifies the components of each insurer's monetary settlement with Goodrich, the insurers paid for a release from liability to Goodrich for a much wider array of claims than simply EDC groundwater remediation at Calvert City. Goodrich released the settling insurers from liability for the cleanup of other contaminants and from liability for claims for personal injury and other property damage. Commercial Union and the London Market Insurers oversimplify this issue to suggest that the trial court could just deduct the total settlement dollars ($58.5 million) from the jury's damage award ($42 million) to completely offset the damages awarded in this case.
 {¶ 43} Moreover, the dollar amounts of insurers' settlements were not likely confined to compensating Goodrich for its property damage or other potential liability claims. In Fidelholtz v. Peller (1998),81 Ohio St.3d 197, 201, the Ohio Supreme Court stressed that defendants settle for many reasons in addition to compensating the plaintiff for its injury "such as the avoidance of bad publicity and litigation costs, the possibility of an adverse verdict, and the maintenance of favorable commercial relationships."
 {¶ 44} The record does not quantify the total costs of this litigation, but litigation costs in this case undoubtedly have been phenomenal. The settling insurers were able put an end to litigation costs of their own, as well as potential liability for Goodrich's attorney fees and costs. Goodrich has spent nearly 20 years seeking coverage from its insurers for its environmental cleanup costs at its Calvert City site. The parties have been involved in this litigation for nearly *Page 16 
a decade, and this case does not necessarily end with this appeal, as one or more of the parties may pursue an appeal to the Ohio Supreme Court.
 {¶ 45} Moreover, in addition to the damages found by the jury, the trial court awarded Goodrich over $22 million in attorney fees and litigation costs, which does not account for any of the fees and costs associated with this appeal, nor does it account for the insurers' defense costs. Goodrich was also awarded over $20 million in prejudgment interest. The trial court also made a declaration that Goodrich will likely incur future liability for cleanup costs at Calvert City and that it has a right to be indemnified by Commercial Union and the London Market Insurers. The settling insurers purchased a release from all of this potential liability.
 {¶ 46} Because Commercial Union and the London Market Insurers failed to demonstrate that Goodrich's settlement with other insurers was for the "same damages" that Goodrich recovered in this action, the trial court did not err in failing to further offset the damage award. The second assignment of error of Commercial Union and the fourth and fifth assignments of error of the London Market Insurers are overruled.
 Prejudgment Interest COMMERCIAL UNION'S ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED IN AWARDING PREJUDGMENT INTEREST AGAINST CU ON SUMS NOT `DUE AND PAYABLE'."
 CROSS-ASSIGNMENT OF ERROR III AGAINST C.U. "THE TRIAL COURT ERRED IN ITS PREJUDGMENT INTEREST CALCULATION BY FAILING TO GIVE EFFECT TO UNAMBIGUOUS LANGUAGE IN CU POLICY E22-8502-313 THAT LOSS IS PAYABLE ONCE GOODRICH PAYS THE AMOUNT OF UNDERLYING LIMITS."
 CROSS-ASSIGNMENT OF ERROR III AGAINST LONDON "THE TRIAL COURT ERRED IN FAILING TO AWARD PREJUDGMENT INTEREST AGAINST LONDON." *Page 17 
 {¶ 47} After Goodrich prevailed at trial, the parties briefed and the trial court later held a hearing on the issue of prejudgment interest. Goodrich moved for prejudgment interest pursuant to R.C. 1343.03(A), which provides that Goodrich was entitled to interest from the date that the contractual obligation became "due and payable" under the contract.
 {¶ 48} The trial court ultimately awarded Goodrich prejudgment interest against Commercial Union, payable from June 30, 1995, the date that Goodrich settled its claims with its primary insurer. The trial court awarded Goodrich no prejudgment interest against the London Market Insurers.
 {¶ 49} Commercial Union challenges the prejudgment interest award through its third assignment of error. Through two cross-assignments of error, Goodrich contends that the trial court erred in its calculation of prejudgment interest against Commercial Union and that it erred in failing to award it any prejudgment interest on its damage judgment against the London Market Insurers.
 {¶ 50} To facilitate discussion, this Court first will address Goodrich's challenge regarding the London Market Insurers.
 London Market Insurers {¶ 51} Although Goodrich also sought prejudgment interest on the damage award against the London Market Insurers, the trial court awarded no prejudgment interest against them.
 {¶ 52} Goodrich makes a purely legal argument here. It maintains that, given that the jury had found a breach of contract by the London Market Insurers, the court had no discretion not to award prejudgment interest, as it was required by R.C. 1343.03(A) to do so. This Court agrees. *Page 18 
 {¶ 53} After the parties filed their briefs in this case, this Court adopted the legal position that had been followed by many other appellate districts that the trial court has no discretion not to award prejudgment interest on a breach of contract:
 "[A]lthough not expressly stated by this Court, numerous appellate districts have found, and we agree, that `once a plaintiff receives judgment on a contract claim, the trial court has no discretion but to award prejudgment interest under R.C. 1343.03(A).' Zunshine v. Cott, 10th Dist. No. 06AP-868, 2007-Ohio-1475, at ¶ 25, citing First Bank of Marietta v. L.C. Ltd. (Dec. 28, 1999), 10th Dist. No. 99AP-304. See, also, Stoner v. Allstate Ins. Co., 5th Dist. No. 05 CA 16, 2006-Ohio-3998, at ¶ 18 (holding that R.C. 1343.03(A) is mandatory requiring a trial court to award prejudgment interest); Water Works Supplies, Inc. v. Grooms Constr. Co., Inc., 4th Dist. No. 04CA12, 2005-Ohio-1292, at ¶ 32 (holding that `[t]he mandatory language of R.C. 1343.03(A) means that the trial court must award prejudgment interest when appropriate.'); Indiana Ins. Co. v. Farmers Ins. of Columbus, 5th Dist. No. 2002 AP 11 0090, 2003-Ohio-4851, at ¶ 60 (noting that the statutory language of R.C. 1343.03(A) that creditor is entitled to interest is mandatory)." Zeck v. Sokol, 9th Dist. No. 07CA0030-M, 2008-Ohio-727, at ¶ 44.
 {¶ 54} Because the jury found a breach of contract by the London Market Insurers, the trial court had no discretion to deny Goodrich's request for prejudgment interest against that party. Its only decision was to determine when the interest would begin to run, or when the obligation became "due and payable." The trial court erred in failing to grant Goodrich prejudgment interest on its damage claim against the London Market Insurers.
 {¶ 55} As will be noted below, in its award of prejudgment interest against Commercial Union, the trial court looked to the specific language of the Commercial Union policies and the facts surrounding Goodrich's claims negotiations with it to determine when prejudgment interest became due and payable. Goodrich held different policies with the London Market Insurers, however, and the facts surrounding its claims negotiations and coverage demands with the London Market Insurers were also different from the situation with Commercial Union. Therefore, the trial court will need to determine when prejudgment interest begins to run against *Page 19 
the London Market Insurers because the court may determine that Goodrich's contractual obligation became "due and payable" from the London Market Insurers on a different date from the date that its claim became "due and payable" from Commercial Union. Consequently, it is necessary for this Court to remand to the trial court for a hearing on this matter.
 {¶ 56} Moreover, as the London Market Insurers were held jointly and severally liable with Commercial Union for the full $22 million damage judgment, and Goodrich has already been awarded prejudgment interest against Commercial Union on the full damage award, the trial court must determine the extent to which liability for the prejudgment interest award will be allocated between the London Market Insurers and Commercial Union. Goodrich's third cross-assignment of error against the London Market Insurers is sustained.
 Commercial Union {¶ 57} Goodrich and Commercial Union also challenge the trial court's calculation of the prejudgment interest award against Commercial Union. Goodrich and Commercial Union agree that prejudgment interest should accrue from the date the contractual obligation became "due and payable" under the insurance contract. See R.C. 1343.03(A). Their dispute focuses on when Commercial Union's contractual obligation to Goodrich became "due and payable." The trial court found the "due and payable" date to be June 30, 1995, when Goodrich settled its claims with its primary insurer.
 {¶ 58} This Court reviews the trial court's determination of when prejudgment interest became "due and payable" under an abuse of discretion standard. Zunshine v. Cott, 10th Dist. No. 06AP-868,2007-Ohio-1475, at ¶ 26. An "abuse of discretion" means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. An abuse of discretion is more than an error of judgment, but instead *Page 20 
demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621.
 {¶ 59} Although Commercial Union contends that the trial court abused its discretion by awarding prejudgment interest from June 30, 1995, it fails to propose an alternate "due and payable" date. Instead, it essentially maintains that the trial court abused its discretion by awarding any prejudgment interest because the damages were disputed until the jury resolved the dispute.[2]
 {¶ 60} As explained above, however, after Goodrich was awarded a damage judgment on its breach of contract claim against Commercial Union, the trial court was obligated to award prejudgment interest pursuant to R.C. 1343.03(A). See Zeck, at ¶ 44.
 {¶ 61} Although Goodrich contends that the trial court should have used an earlier "due and payable" date, it has failed to demonstrate any abuse of discretion by the trial court. Goodrich maintains that, based on the loss payable language in one of its three insurance policies with Commercial Union, the trial court should have awarded prejudgment interest from the date that Goodrich had actually paid $20 million in cleanup costs, an earlier date than when it settled with its primary insurer. It further maintains that "[i]f Goodrich chooses CU's second policy to pay this loss, the effect of the trial court's ruling would be to leave Goodrich less than whole[.]"
 {¶ 62} Even if construction of the loss payable language in the second Commercial Union policy supported Goodrich's argument for an earlier "due and payable" date, Goodrich had not selected that policy at the time the trial court made its prejudgment interest *Page 21 
determination. Goodrich cannot demonstrate any actual prejudice by the court's prejudgment interest calculation but merely speculates as to what prejudice it may suffer "if" it chooses the second policy.
 {¶ 63} Moreover, as this Court reviews this decision under an abuse of discretion standard, it was not unreasonable or arbitrary for the trial court to select a "due and payable" date that would be applicable to all three Commercial Union policies, regardless of which policy Goodrich will ultimately choose. The trial court explained that when Goodrich settled its claims with its primary insurer in 1995, coverage under the terms of the Commercial Union policies was triggered and, because Goodrich had given notice to Commercial Union long before that time, Commercial Union had adequate time to investigate the claim and ensure that its liability had been triggered. This Court finds no abuse of discretion in the trial court's determination of when Commercial Union's obligation became "due and payable" to Goodrich under the contracts of insurance.
 {¶ 64} Goodrich's third cross-assignment of error against the London Market Insurers is sustained. Commercial Union's third assignment of error and Goodrich's third cross-assignment of error against Commercial Union are overruled.
 Attorney Fee Award COMMERCIAL UNION'S ASSIGNMENT OF ERROR IV "THE TRIAL COURT ERRED WHEN IT DENIED CU'S MOTION FOR JNOV AND AWARDED GOODRICH ATTORNEY FEES AND COSTS INCURRED IN THIS ACTION." *Page 22 
 LONDON MARKET'S ASSIGNMENT OF ERROR VI "THE TRIAL COURT ERRED WHEN IT DENIED CERTAIN LONDON MARKET [INSURERS'] MOTION FOR JNOV AND AWARDED ATTORNEYS FEES IN THIS BREACH OF CONTRACT ACTION."
 {¶ 65} Both appellants contend that the trial court erred in denying their motions for judgment notwithstanding the verdict based on the award of attorney fees to Goodrich on its breach of contract claims. Commercial Union further contends that the trial court erred in awarding attorney fees on Goodrich's bad faith claim. The appellants contend that the attorney fee award should be vacated because the jury failed to find malice or bad faith on the part of either defendant.
 {¶ 66} The appellants challenge the legal soundness of an attorney fee award in this case, apparently ignoring the fact that such an award was completely within the parameters of the legal instructions that the trial court gave to the jury. The jury was not instructed that it must first find bad faith and/or award punitive damages before awarding attorney fees. Instead, the trial court instructed the jury that it could award attorney fees as a component of compensatory damages on the bad faith claim against Commercial Union as well as the claims for breach of contract against both appellants.
 {¶ 67} Without any objection on the record by Commercial Union or the London Market Insurers, after six weeks of trial and much discussion by the parties and the trial judge about how the court would instruct the jury, the trial court instructed the jury that Goodrich was claiming attorney fees as a component of its breach of contract damages. The court further instructed the jury:
 "If you find for Goodrich, you should determine whether its attorney fees in this case are damages for which it should be compensated. You do not need to determine the amount of attorney fees incurred in this case. If you decide that *Page 23 
Goodrich is entitled to recover its attorney fees in this case, the court will determine the amount."
 {¶ 68} Jury Interrogatory Question Number 60 asked the following:
 "Not including the claim of bad faith, do you find that any damages include the attorney fees Goodrich incurred in this case? If the answer to this question is `yes,' you shall not determine an amount for such damages or include an amount in any calculation of damages."
 {¶ 69} The jury answered "yes" to Interrogatory Question Number 60 and, as it had been instructed by the trial court, did not determine an amount of attorney fees or include an amount in its calculation of damages.
 {¶ 70} Likewise, as quoted above in this Court's discussion of Commercial Union's first assignment of error pertaining to the bad faith claim judgment, the jury was instructed that it could award attorney fees as a component of damages on the bad faith claim, it was given interrogatories to that effect, and it made a finding that Goodrich was entitled to attorney fees on its bad faith claim. Commercial Union raised no objection on the record to those instructions or special interrogatories.
 {¶ 71} The jury followed its instructions and, as it was instructed that it could award attorney fees as a component of compensatory damages, it did. The appellants later attempted to vacate this award, contending that there was no legal basis to award attorney fees in this case.
 {¶ 72} Although the parties dispute whether the appellants raised this issue in their post-trial motions, it is clear from the record that they acquiesced in allowing the issue of attorney fees to go to the jury. The parties cannot wait until after trial to challenge the legal soundness of the jury instructions through a motion for judgment notwithstanding the verdict when they raised no objection to those instructions before they were given to the jury. See Hinkle v. Cornwell Quality ToolCo. (1987), 40 Ohio App.3d 162, 164-165 (implicitly holding that jury instructions *Page 24 
cannot be challenged through a motion for judgment notwithstanding the verdict where there was no objection at trial).
 {¶ 73} Commercial Union and the London Market Insurers essentially challenge the trial court's legal instruction to the jury on attorney fees, which they did not challenge at trial. Civ. R. 51(A) provides that "a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." The Ohio Supreme Court has also repeatedly stressed that, to preserve an issue for review, a party must "timely advise a trial court of possible error, by objection or otherwise[.]"Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, 121.
 {¶ 74} The parties and the jury sat through a lengthy trial that lasted nearly seven weeks. The trial court gave the parties every opportunity to have input into the jury instructions and interrogatories. There is nothing in the record to indicate any attempt by the appellants to correct this alleged error at the appropriate time. The trial court did not err in failing to correct an alleged error that the appellants acquiesced in and waited to raise until after they received an unfavorable decision by the jury. The fourth assignment of error of Commercial Union and the sixth assignment of error of the London Market Insurers are overruled.
 Allocation of Attorney Fees CROSS-ASSIGNMENT OF ERROR IV AGAINST LONDON "THE TRIAL COURT ERRED IN REDUCING LONDON'S RESPONSIBILITY FOR GOODRICH'S ATTORNEYS' FEES."
 {¶ 75} After hearing disputed evidence as to the reasonableness and necessity of Goodrich's attorney fees in this litigation, the trial court determined that Goodrich was entitled to receive compensation from the appellants for over $22 million in attorney fees and litigation *Page 25 
costs. To allocate the appellants' responsibility for this attorney fee award, the trial court further ordered that Commercial Union would be held responsible for a greater portion of the attorney fees because Goodrich also had been awarded attorney fees on its bad faith claim against Commercial Union.
 {¶ 76} Through its fourth cross-assignment of error against the London Market Insurers, Goodrich argues that the trial court erred in its allocation of the appellants' responsibility to pay Goodrich's attorney fees. Specifically, Goodrich contends that the trial court erred in reducing the responsibility of the London Market Insurers for the attorney fee award.
 {¶ 77} Goodrich recognizes that the trial court's determination of the amount of attorney fees to award was discretionary and that this Court will affirm that decision absent an abuse of discretion. See, e.g.,Bittner v. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143, 146. Goodrich contends that its attorney fees were reasonable and argues against a reduction of its attorney fee award, implying that this aspect of the trial court's order somehow reduced the attorney fees that Goodrich was awarded. The trial court did not reduce the dollar amount of attorney fees awarded to Goodrich, however; it simply required Commercial Union to pay a greater share of the award than the London Market Insurers.
 {¶ 78} Goodrich has failed to demonstrate any abuse of discretion by the trial court in holding Commercial Union responsible for a greater portion of the attorney fee award. The trial court explained that the bad faith verdict was solely against Commercial Union, that Goodrich was awarded attorney fees as damages on the bad faith claim in addition to its breach of contract claims, and that the London Market Insurers should not be responsible for that share of the attorney fees because they prevailed on the bad faith claim against them. *Page 26 
 {¶ 79} Bearing in mind that it was "impossible to determine with mathematical precision the time and costs attributable solely to the bad faith claim[,]" the trial court allocated the attorney fees between the breach of contract claims and the bad faith claim based on the percentage of jury interrogatories attributable to the bad faith claim. The trial court explained that it considered that percentage, 12 percent, to be a reasonable estimate of the costs and time that Goodrich devoted solely to the bad faith claim. Therefore, the trial court held Commercial Union solely responsible for 12 percent of the attorney fees and Commercial Union and the London Market Insurers jointly and severally liable for the remaining 88 percent of the attorney fee award.
 {¶ 80} Goodrich has failed to demonstrate anything arbitrary or unreasonable about the trial court's allocation of responsibility for the attorney fee award between Commercial Union and the London Market Insurers. Goodrich's fourth cross-assignment of error against the London Market Insurers is overruled.
 Litigation Expenses CROSS-ASSIGNMENT OF ERROR IV AGAINST C.U. CROSS-ASSIGNMENT OF ERROR V AGAINST LONDON "THE TRIAL COURT ERRED IN EXCLUDING CERTAIN OF GOODRICH'S LITIGATION EXPENSES."
 {¶ 81} The parties agree that the assessment of litigation costs also lies within the sound discretion of the trial court. See Howard v.Wills (1991), 77 Ohio App.3d 133, 137. Goodrich contends that the trial court abused its discretion by refusing to award it certain litigation expenses. Specifically, the trial court refused to order Commercial Union and the London Market Insurers to reimburse Goodrich for the fees it had incurred due to traveling for the purpose of taking depositions or for out-of-town counsel to travel to Akron for trial. *Page 27 
 {¶ 82} In the same order denying Goodrich recovery of these costs, however, the trial court indicated that it would award Goodrich its attorney fees for both local and national counsel, fees which were later determined to be over $20 million. Commercial Union and the London Market Insurers had argued that Goodrich should not receive attorney fees for both its local counsel and national counsel because their work was duplicative and the national counsel, who were more experienced in environmental litigation, charged significantly higher hourly rates than Goodrich's local counsel. Nonetheless, the trial court awarded Goodrich attorney fees that had been charged by both its local and national counsel.
 {¶ 83} In the very next paragraph of its order, however, the trial court explained that it would not allow Goodrich to recover counsel's travel and meal expenses. The court explained that "[e]xpenses such as these are not capable of evaluation as to their reasonableness. The court notes that the hourly rate of compensation for counsel is sufficient for living and travel expenses."
 {¶ 84} The trial court's explanation for denying Goodrich recovery of its travel expenses as part of its attorney and litigation fees was not unreasonable or arbitrary. Moreover, Goodrich fails to cite any legal authority that it has a right to recover travel expenses as part of its litigation fee award. In fact, Commercial Union and the London Market Insurers cite authority that travel expenses are not recoverable as litigation costs. See, e.g., Taylor v. McCullough-Hyde Mem. Hosp.
(1996), 116 Ohio App.3d 595, 601.
 {¶ 85} Goodrich has failed to demonstrate an abuse of discretion by the trial court and its fourth cross-assignment of error against Commercial Union and its fifth cross-assignment of error against the London Market Insurers are overruled. *Page 28 
 Ongoing Fees CROSS-ASSIGNMENT OF ERROR V AGAINST C.U. CROSS-ASSIGNMENT OF ERROR VI AGAINST LONDON "THE TRIAL COURT ERRED BY NOT AWARDING GOODRICH ONGOING FEES AND EXPENSES."
 {¶ 86} Through its fifth cross-assignment of error against Commercial Union and its sixth cross-assignment of error against the London Market Insurers, Goodrich asserts that, when the trial court determined the attorney fee award, it erred in denying its request for ongoing fees and costs, including its attorney fees and costs of this appeal. In a very brief argument, Goodrich maintains that the trial court was required to award it attorney fees for this appeal.
 {¶ 87} Goodrich relies on two cases that were not breach of contract cases, but were instead declaratory judgment actions brought by insureds under the former R.C. 2721.09, and attorney fees were allowed under that statutory authority. See Willoughby Hills v. Cincinnati Ins. Co. (1986),26 Ohio App.3d 146; Koch Koasis Land Co., Inc. v. Motorits Mut. Ins.Co. (June 13, 1990), 7th Dist. No. 89 C.A. 36.
 {¶ 88} Under former R.C. 2721.09, attorney fees could be granted by the trial court in declaratory judgment actions whenever "necessary and proper," yet those requirements were often interpreted loosely. InMotorists Mut. Ins. Co. v. Brandenburg (1995), 72 Ohio St.3d 157, 158, the Ohio Supreme Court explained that absent some statutory authority to the contrary, the general "American Rule" is that parties to a legal dispute pay their own attorney fees. The court further held that former R.C. 2721.09 provided a trial court with statutory authority "to assess attorney fees based on a declaratory judgment issued by the court" and that the trial court had full discretion to award such fees. Id. at 160. *Page 29 
 {¶ 89} Effective September 24, 1999, in explicit response to theBrandenburg decision, the Ohio General Assembly amended R.C. 2721.09 and enacted R.C. 2721.16 to place a limitation on attorney fees that can be recovered in declaratory judgment actions. See Staff Notes to R.C.2721.16. The parties discussed on the record that the court's authority to award attorney fees in declaratory judgment actions was now limited by statute and the trial judge explicitly noted that she would not be awarding attorney fees in the declaratory judgment action.
 {¶ 90} Because the cases cited by Goodrich have no application here, Goodrich has demonstrated no error by the trial court in failing to award ongoing attorney fees and litigation expenses. Its fifth cross-assignment of error against Commercial Union and its sixth cross-assignment of error against the London Market Insurers are overruled.
 Damages CROSS-ASSIGNMENT OF ERROR II AGAINST C.U. CROSS-ASSIGNMENT OF ERROR II AGAINST LONDON "THE TRIAL COURT ERRED IN DENYING GOODRICH'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT REGARDING DAMAGES FOR PAST REMEDIATION COSTS"
 {¶ 91} Goodrich contends that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict on the issue of damages. Specifically, it maintains that it presented evidence to establish that its past remediation costs were over $74 million and the jury's finding that it had proven only $42 million in damages was irrational and not supported by the evidence.
 {¶ 92} To reiterate, a motion for judgment notwithstanding the verdict should be granted if, after construing the evidence most strongly in favor of the nonmoving party, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is *Page 30 
adverse to such party." Civ.R. 50(A). In other words, to prevail on its motion for judgment notwithstanding the verdict, Goodrich was required to prove that reasonable minds could only conclude that it had proven over $74 million in past remediation costs that were covered losses under its excess insurance policies.
 {¶ 93} Goodrich relies on a case in which the Third District Court of Appeals reversed the trial court's denial of a judgment notwithstanding the verdict because there was only one rational way to view the damage evidence and reasonable minds could not have viewed it otherwise. SeeBellman v. Ford Motor Co., 3d Dist. No. 12-04-11, 2005-Ohio-2777, at ¶ 28-29. Goodrich essentially contends that the Bellman reasoning is fully applicable here because its damage evidence was clear and undisputed. Unlike the Bellman case, however, the damage evidence in this case was disputed by the insurers and could have been interpreted in a variety of ways by the jury. Reasonable minds could have come to many different conclusions in determining Goodrich's breach of contract damages.
 {¶ 94} Although Goodrich presented evidence that its past remediation costs were in excess of $74 million, the defendant insurers vigorously disputed whether many of those costs were reasonable and/or necessary to the remediation efforts at the Calvert City site. The insurers focused on many facts that could have led the jurors to reduce Goodrich's damages.
 {¶ 95} For example, Goodrich presented evidence that it chose to do the groundwater remediation itself, rather than having the government run the remediation, as a means of controlling the costs. There was evidence before the jury to dispute whether the methods chosen by Goodrich to clean the groundwater were the most cost effective, however. Moreover, the insurers disputed whether some of Goodrich's claimed remediation costs were actually costs *Page 31 
incurred due to the production process, due to unrelated groundwater monitoring requirements, or were otherwise not solely related to this cleanup effort.
 {¶ 96} There were no cost invoices for most of the work done by Goodrich and the insurers maintained throughout the trial that many of Goodrich's self-estimated costs were grossly inflated. Even an expert who purported to have verified Goodrich's remediation costs conceded that his role was to determine whether Goodrich had incurred the costs it listed, not whether the costs were reasonable and necessary. There was also testimony from another Goodrich witness that, after Goodrich sold most of its Calvert City plant to Westlake Vinyls, it was necessary to purchase steam from Westlake to run the groundwater strippers and Westlake had been charging Goodrich inflated rates for the steam. That same witness further testified that 45 percent of the waste currently being treated at the main groundwater stripper was attributable to Westlake's production process.
 {¶ 97} In 1993, Goodrich spun off its GEON vinyl division into a separate company, GEON. GEON later merged with another company to form PolyOne. Since the 1993 spin-off, through a contract with Goodrich, GEON/PolyOne agreed to pay the Calvert City ongoing remediation costs. Although Goodrich maintained during trial that it was the only party legally responsible to the government for the cleanup costs, the evidence was not disputed that GEON/PolyOne had assumed contractual liability to Goodrich to pay those costs since 1993 and that it had been doing so. The costs paid by GEON/PolyOne accounted for $29.3 million of the total damages sought by Goodrich. The insurers contended that they should have no obligation to indemnify Goodrich against any cleanup costs incurred since 1993 because these costs are being paid by PolyOne ("the PolyOne defense"). *Page 32 
 {¶ 98} There was also evidence that some of the groundwater contamination came from the settling ponds and that Goodrich did not close the ponds until it was required to do so because it was too expensive. The insurers argued that, had Goodrich closed the ponds earlier, the EDC contamination may have been lessened.
 {¶ 99} The insurers gave the jury many reasons to reduce the damages sought by Goodrich in this case. There were no jury interrogatories that required the jury to break down the damage award in a manner that would explain why the jury found damages of $40 million, plus $2 million in underlying litigation costs, rather than $74 million. Absent such explicit findings by the jury, this Court will not begin to speculate about which of the insurers' challenges persuaded the jury to award less than the total damages sought by Goodrich.
 {¶ 100} It is clear from the record, however, that much of Goodrich's evidence on whether its remediation costs were necessary and reasonable was disputed and there were many reasons upon which the jury could have based a decision to reduce Goodrich's damage figure. Because reasonable minds could have come to many conclusions on the calculation of Goodrich's damages, the trial court did not err in denying Goodrich's motion for judgment notwithstanding the verdict. Goodrich's second cross-assignment of error against Commercial Union and its second cross-assignment of error against the London Market Insurers are overruled.
 Declaratory Judgment COMMERCIAL UNION'S ASSIGNMENT OF ERROR V "THE TRIAL COURT ERRED WHEN IT ENTERED DECLARATORY JUDGMENT RELIEF IN FAVOR OF GOODRICH."
 LONDON MARKET'S ASSIGNMENT OF ERROR X "IF IT IS DETERMINED THAT THE TRIAL COURT ENTERED DECLARATORY JUDGMENT RELIEF AGAINST ANY OF THE CERTAIN LONDON MARKET INSURERS, WHICH EACH CERTAIN LONDON *Page 33 
MARKET INSURER DENIES, IT WAS ERROR TO ENTER SUCH DECLARATORY RELIEF."
 {¶ 101} The jury determined that Commercial Union and the London Market Insurers had breached their insurance contracts with Goodrich by failing to provide coverage for $40 million that Goodrich expended for past cleanup costs at Calvert City as well as $2 million in underlying litigation expenses. Goodrich had also sought a declaration that the insurers were contractually obligated to provide coverage for future cleanup costs at the site. The issue of liability for future costs was decided through a post-trial proceeding and the trial court determined that Goodrich had established that damages at its Calvert City site are "covered damages" under its contracts of insurance, that its damages continue to accrue, and that the insurers are required to pay Goodrich for the remediation and defense costs it has incurred or will incur after September 30, 2005 at the Calvert City site.
 {¶ 102} The London Market Insurers assign error to the trial court's entry of a declaratory judgment "if it is determined that the trial court entered declaratory judgment relief against any of the [C]ertain London Market Insurers[.]" Although the trial court's initial entry on this matter made no explicit reference to the London Market Insurers, its later judgment entry that summarized the final judgment did. The second, more comprehensive entry clearly entered a declaratory judgment against the London Market Insurers.
 {¶ 103} Through its comprehensive order that summarized the rights and obligations of Commercial Union, the London Market Insurers, and Goodrich, the trial court declared that Commercial Union and the London Market Insurers are required to pay the defense and remediation costs that Goodrich incurs after September 30, 2005, plus interest from the date those costs are incurred, if Goodrich selects coverage under one of their insurance policies. *Page 34 
 {¶ 104} Commercial Union and the London Market Insurers contend that the trial court erred in determining that Goodrich has a right to insurance coverage for future cleanup costs because PolyOne is contractually obligated to pay those costs. As this Court noted in its discussion of Goodrich's cross-assignments of error on damages, the insurers raised this "PolyOne defense" at trial. They had already brought this defense before the jury when it determined their liability on the breach of contract claims. This post-trial proceeding was not an opportunity to relitigate liability issues.
 {¶ 105} The trial court determined prior to the beginning of trial that certain issues would not be decided by the jury, but would be determined by the trial court after trial, if the jury found bad faith and/or breach of contract. Those issues included prejudgment interest, attorney fees, and whether Goodrich will incur future cleanup costs.
 {¶ 106} As the trial court explained to the parties prior to the commencement of trial:
 [I]t's my understanding that if coverage is found here, that the jury will be asked to assess the damages in respect to claims which should have been allowed to date, but if a declaration of coverage is made, then any future costs are going to have to be submitted as you would any other claim for coverage, and the court is not going to permit any evidence to be presented during this trial regarding what those future costs may be."
The trial court further held in a written order that:
 "Insurer Defendants' Motion in Limine to Bar Goodrich from Introducing Testimony or Other Evidence Regarding Goodrich's Alleged Future Costs is GRANTED. The Court will hear evidence on the issue that there will in fact be future costs, but this evidence will not be presented to the jury."
It was determined prior to trial that the issue of future costs, as well as prejudgment interest, attorney fees, and settlement credits would not be determined by the jury but, in the event the jury found liability on the part of the insurers, the issues would be determined by the trial court through post-trial proceedings. As quoted above, the trial court clearly emphasized prior to trial *Page 35 
that the only issue for later determination on the issue of future costs was whether "there will in fact be future costs."
 {¶ 107} Although Commercial Union and the London Market Insurers attempted to relitigate their PolyOne defense through this post-trial proceeding, this was not an opportunity for them to do so. Just as they could not relitigate liability issues during the post-trial proceedings on attorney fees, prejudgment interest, or settlement credits, they could not do so in this limited proceeding on future costs.
 {¶ 108} The PolyOne defense to the insurers' obligation to cover Goodrich's remediation costs incurred after 1993 was put before the jury to determine as the trier of fact. Because the parties did not test the issue with a jury interrogatory, however, there is no way of knowing the jury's finding on this defense. Nonetheless, the insurers put this coverage defense before the jury at trial and implicitly asked the jury to make a finding on this defense. Because the jury was not asked to make a finding, we do not know whether the jury accepted or rejected this defense.
 {¶ 109} The absence of an explicit finding by the jury on the PolyOne defense, however, did not give the parties an opportunity to relitigate the issue through a post-trial proceeding before the trial judge. The Rules of Civil Procedure provide limited avenues for the trial court to delve into or overturn a jury's findings, none of which was followed here. Because the PolyOne defense was not properly before the trial court in this post-trial proceeding, the trial court did not err in refusing to revisit that defense.
 {¶ 110} In a brief, additional argument, Commercial Union asserts that declaratory relief was also inappropriate because it is unknown whether Goodrich will incur further liability and declaratory relief cannot be based on speculative future events. Although the trial court noted in its initial judgment entry that Goodrich "may" incur future costs, the evidence before the court *Page 36 
was not disputed that there will be additional environmental cleanup costs incurred at the Calvert City site and, aside from the PolyOne defense, the defendants did not dispute that Goodrich will incur liability for those costs.
 {¶ 111} The trial court found, based on the presentation of evidence that Goodrich will incur future cleanup costs, that Commercial Union and the London Market Insurers are "required to pay to Goodrich Corporation the remediation and defense costs [Goodrich] has incurred or will incur subsequent to September 30, 2005" for cleaning up the Calvert City site and for defending underlying actions in accordance with any of their contracts of insurance selected under Goodyear Tire Rubber Co. v.Aetna Cas. Sur. Co., 95 Ohio St.3d 512, 2002-Ohio-2842.
 {¶ 112} Because Commercial Union and the London Market Insurers have failed to demonstrate any error in the trial court's declaratory judgment, Commercial Union's fifth assignment of error and the London Market Insurers' tenth assignment of error are overruled.
 Pollution Exclusion COMMERCIAL UNION'S ASSIGNMENT OF ERROR VI "THE TRIAL COURT ERRED BY DENYING CU'S MOTIONS FOR DIRECTED VERDICT AND [JUDGMENT NOTWITHSTANDING THE VERDICT] BASED ON ITS POLLUTION EXCLUSION."
 LONDON MARKET'S ASSIGNMENT OF ERROR VII "THE TRIAL COURT ERRED BY DENYING CERTAIN LONDON MARKET INSURER'S MOTION FOR A DIRECTED VERDICT OR JNOV BASED ON THEIR POLLUTION EXCLUSIONS."
 {¶ 113} Through Commercial Union's sixth assignment of error and the London Market Insurers' seventh assignment of error, both appellants contend that the trial court erred in failing *Page 37 
to grant either a directed verdict or a judgment notwithstanding the verdict based on the pollution exclusions in some of the relevant insurance policies.[3]
 {¶ 114} Again restating the standard, a trial court should grant a motion for directed verdict or a motion for judgment notwithstanding the verdict only if, after construing the evidence most strongly in favor of the nonmoving party, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A). Consequently, the trial court would have erred in denying these motions only if the jurors could only have found that the pollution exclusions in some of the insurance policies issued by Commercial Union and the London Market Insurers precluded coverage for the Calvert City cleanup costs.
 {¶ 115} There was evidence that one of the Commercial Union policies and some of the London Market Insurers' policies issued beginning in the early 1970s included pollution exclusions with "sudden and accidental" exceptions. Basically, these pollution exclusions provided that there would be no insurance coverage for property damage caused by the discharge or release of pollutants into the environment unless the release or discharge was sudden and accidental. Thus, Goodrich was required to establish that its property damages (EDC groundwater contamination) had been caused by releases of EDC into the environment that were both abrupt and accidental. See Hybud Equip. Corp. v. SphereDrake Ins. Co., Ltd. (1992), 64 Ohio St.3d 657, 665. Ohio courts have held that the burden is upon the policyholder to establish that the exception to the pollution exclusion is applicable. Plasticolors, Inc.v. Cincinnati Ins. *Page 38 Co. (1992), 85 Ohio App.3d 547, 550.
 {¶ 116} Thus, the parties' litigation on this issue necessarily focused on the possible causes of EDC groundwater contamination at Calvert City: gradual EDC discharges from the plant versus sudden and accidental spills of EDC. Goodrich presented evidence that there had been several sudden and accidental releases of EDC at the Calvert City plant during the relevant time frame and that these sudden and accidental spills were among the main sources of EDC contamination at the site.
 {¶ 117} The relevant spills included a rupture in a pipeline through which EDC was pumped into the plant from barges on the Tennessee River. It was estimated that approximately 60,000 gallons of EDC had spilled by the time the leak was discovered and the transfer was shut down. Another spill of approximately 2,000-6,000 gallons of EDC-containing water occurred due to a reactor problem. Goodrich also presented evidence that there had been additional significant spills of EDC that had been sudden and accidental: 7,000-10,000 gallons of vinyl chloride, 4,000-6,000 gallons of EDC-containing wastes, and 750,000 pounds of vinyl chloride.
 {¶ 118} The insurers concede that Goodrich presented evidence of many sudden and accidental releases of EDC at the Calvert City site. Goodrich also presented evidence that the sudden releases of EDC contributed to the property damage at the site, but that it was virtually impossible to measure how much EDC contamination came from a given source. Goodrich established facts that there had been sudden and accidental releases of EDC that caused property damage, but it was unable to quantify the extent of property damage that was solely attributable to the sudden releases of EDC.
 {¶ 119} The dispute between the parties is whether Goodrich's coverage under the sudden and accidental exception to the pollution exclusions was limited to the property damage that it *Page 39 
could directly attribute to the sudden spills. The parties do not cite, nor could this court find, any Ohio authority that directly addresses this issue.
 {¶ 120} It is the position of Commercial Union and the London Market Insurers that, because Goodrich could not demonstrate how much of the EDC contamination was directly attributable to the sudden and accidental releases, it had failed to prove that any of its damages qualified for coverage under the sudden and accidental exception to the pollution exclusions. The insurers cite a single California appellate decision to support their position. See Golden Eagle Refinery Co., Inc. v.Associated Internatl. Ins. Co. (2001), 85 Cal.App.4th 1300, 1314-15. TheGolden Eagle decision was called into question by another California appellate district, however, because its reasoning purportedly ignored California Supreme Court case law on the issue of insurance coverage when there are concurrent causes of the property damage. See State v.Underwriters at Lloyd's London (2006), 54 Cal.Rptr.3d 343, 357-61, certiorari granted, (2007), 57 Cal.Rptr.3d 542.
 {¶ 121} Goodrich, on the other hand, maintains that because its property damage resulted from both an insured cause (sudden and accidental spills) and an excluded cause (gradual EDC releases) that are indivisible, the insurance policy covers the loss. Goodrich maintains, with supporting authority, that Ohio courts follow a "concurrent cause" theory of insurance recovery. Where property damage results from more than one contributing cause, and the insurance policy "expressly insures against direct loss and damage by one element but excludes loss or damage by another element, the coverage extends to the loss even though the excluded element is a contributory cause." Andray v. Elling, 6th Dist. No. L-04-1150, 2005-Ohio-1026, at ¶ 34, quoting Gen. Am. Transp.Corp. v. Sun Ins. Office, Ltd. (C.A.6, 1966), 369 F.2d 906, 908. *Page 40 
 {¶ 122} Courts in other jurisdictions, including the Supreme Courts of Minnesota and Rhode Island, have applied the concurrent causation doctrine to situations such as this, where damages are caused by both insured and uninsured causes that are indivisible, and have concluded that there is insurance coverage in such situations. See, e.g.,Sav-o-Mat, Inc. v. Nat'l Farmers Union Property and Cas. Co. (Aug. 25, 2005), Colo.Dist.Ct. No. 00 CV 8556; Textron, Inc. v. Aetna Cas. andSur. Co. (2000), 754 A.2d 742; SCSC Corp. v. Allied Mut. Ins. Co.
(1995), 536 N.W.2d 305.
 {¶ 123} The decisions cited above followed the premise that once the insurer establishes that an exclusion is applicable, the burden shifts back to the insured to establish the applicability of an exception to the exclusion. Once the insured has established facts to trigger the sudden and accidental exception, however, the burden shifts back to the insurer to prove that the excluded, gradual releases of pollution were the overriding cause of the insured's damages. The insured does not have the additional burden of proving that the sudden and accidental occurrences were the sole or overriding cause of the damage, for it is ultimately the burden of the insurer to prove that damages fall within an exclusion from coverage. See, e.g., SCSC Corp., 536 N.W.2d at 314. It is also the law in Ohio that "[a] defense based on an exception or exclusion in an insurance policy is an affirmative one, and the burden is cast on the insurer to establish it." Continental Ins. Co. v. LouisMarx Co., Inc. (1980), 64 Ohio St.2d 399, 401, quoting Arcos Corp. v.Am. Mut. Liability Ins. Co. (D.C.E.D.Pa.1972), 350 F.Supp. 380, 384.
 {¶ 124} The position taken by SCSC Corp. seems to be more consistent with Ohio law on concurrent causation than the California position cited by Commercial Union and the London Market Insurers. Therefore, Goodrich established to the jury that it had sustained damages due to sudden and accidental releases of EDC into the groundwater and that those sudden and *Page 41 
accidental releases had caused property damage that was indivisible from the damage caused by gradual releases of EDC. Absent evidence by the insurers to the contrary, Goodrich's failure to prove that the sudden and accidental releases were the sole or overriding cause of its remediation liability did not defeat its claims under the sudden and accidental exception to the pollution exclusions.
 {¶ 125} For the reasons stated above, the trial court did not err in denying the motions for directed verdict and judgment notwithstanding the verdict filed by Commercial Union and the London Market Insurers based on the pollution exclusions in some of their policies. Commercial Unions' sixth and the London Market Insurers' seventh assignments of error are overruled.
 Specificity of Trial Court Judgment LONDON MARKET'S ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED BY ENTERING A COLLECTIVE JUDGMENT AGAINST CERTAIN LONDON MARKET INSURERS, AN ENTITY THAT DOES NOT EXIST."
 LONDON MARKET'S ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED BY AWARDING AN AMOUNT AGAINST THE CERTAIN LONDON MARKET INSURERS IN EXCESS OF THEIR REMAINING SEVERAL SUBSCRIBED PORTIONS OF THE POLICY LIMITS."
 LONDON MARKET'S ASSIGNMENT OF ERROR VIII "THE TRIAL COURT ERRED BY AWARDING GOODRICH DOUBLE DAMAGES."
 LONDON MARKET'S ASSIGNMENT OF ERROR IX "THE TRIAL COURT ERRED BY FAILING TO REQUIRE GOODRICH TO SELECT A TRIGGERED POLICY AGAINST WHICH TO MAKE A CLAIM PRIOR TO ENTRY OF JUDGMENT." *Page 42 
 LONDON MARKET'S ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED BY AWARDING POST-JUDGMENT INTEREST, AS POST-JUDGMENT INTEREST IS NOT DUE UNLESS AND UNTIL AN OBLIGATION TO PAY EXISTS."
 {¶ 126} The London Market Insurers raise several assignments of error that have been grouped together because they all pertain to the London Market Insurers' apparent confusion about particular language in the trial court's judgment entry.
 {¶ 127} The London Market Insurers first contend that the trial court erred in entering judgment against "Certain London Market Insurers," rather than the individual insurance companies, because no such entity exists. To avoid confusion to the court and jury, the London Market Insurers had represented themselves as a collective entity throughout these proceedings. Although the trial court's judgment again makes repeated references to the London Market Insurers as a collective entity, the trial court was also careful to list the specific London Market insurance companies against whom it was entering judgment: "Accident and Casualty Company; Commercial Union Assurance Company; Edinburgh Assurance Company; United Scottish Insurance Company; Victoria Ins. Co. Ltd.; Road Transport, GP AV; Winterthur Swiss Insurance Company; World Auxiliary Insurance Corporation Limited; and Yasuda Fire and Marine Insurance Company." The trial court's judgment entry is clear that judgment was entered against these individual insurance companies, jointly and severally with Commercial Union, and not some collective entity that does not exist. The London Market Insurers' first assignment of error is overruled.
 {¶ 128} Through their second and eighth assignments of error, the London Market Insurers contend that the trial court erred in awarding Goodrich double damages and in entering judgment against them for $22 million because that judgment exceeds the aggregate liability *Page 43 
limits of its remaining policies. The London Market Insurers apparently believe that the trial court's judgment entry awards Goodrich $22 million against Commercial Union and another $22 million against the London Market Insurers. Again, the London Market Insurers seem to misunderstand the trial court's judgment.
 {¶ 129} The trial court explicitly stated that it awarded Goodrich a single award of $22 million in compensatory damages against Commercial Union and the London Market Insurers "jointly and severally." The trial court clearly did not award Goodrich a damage judgment of $44 million, but instead awarded $22 million, for which Commercial Union and the London Market Insurers are jointly and severally responsible. The London Market Insurers' eighth assignment of error is overruled.
 {¶ 130} Moreover, in addition to ordering that there would be joint and several liability on the damage award, the trial court repeatedly stated throughout its judgment entry that its judgment against each defendant insurer presumed selection under Goodyear Tire Rubber Co. v.Aetna Cas. Surety Co., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 12. InGoodyear, the Ohio Supreme Court reversed this Court's decision that had applied a pro rata allocation of liability among insurers for a continuous injury, deciding instead to apply an "all sums" approach. TheGoodyear court held that an insured "is entitled to secure coverage from a single policy of its choice that covers `all sums' incurred as damages `during the policy period,' subject to that policy's limit ofcoverage." (Emphasis added.) Goodyear, at ¶ 11.
 {¶ 131} In other words, under Goodyear, Goodrich has the right to select the policy or policies under which it wishes to pursue coverage, but its right to such coverage is necessarily limited by the liability limits of the selected policies, pursuant to the explicit language ofGoodyear. The trial court's journal entry also states repeatedly that, in the event Goodrich *Page 44 
chooses different coverage (coverage under the other insurer's policy or policies), a given insurer is obligated to pay up to the applicable limits of a selected policy, with interest to be calculated thereon. Therefore, the trial court did not order the London Market Insurers to pay Goodrich a damage award in excess of the aggregate limits of its remaining policies. The London Market Insurers' second assignment of error is overruled.
 {¶ 132} Through their ninth assignment of error, the London Market Insurers contend that the trial court erred in failing to require Goodrich to select a policy for coverage before it entered judgment. The London Market Insurers merely assert that the trial court could have avoided confusion if it had required Goodrich to select a policy for coverage as "recommended" by the Ohio Supreme Court inGoodyear. This Court finds nothing in the Goodyear decision that mandates the trial court to require Goodrich to make a policy selection before it enters judgment. The London Market Insurers have failed to demonstrate any error by the trial court and their ninth assignment of error is overruled.
 {¶ 133} Through their third assignment of error, the London Market Insurers contend that the trial court erred in awarding Goodrich post-judgment interest against it. Aside from reiterating arguments that it raised through other assignments of error, which will not be discussed again here, the London Market Insurers maintain that the trial court erred in awarding post-judgment interest against them, because they will owe no such interest unless Goodrich selects coverage under one of their policies. As explained above, the trial court stated throughout its judgment entry, and specifically pertaining to its award of post-judgment interest against the London Market Insurers, that its award presumed selection under Goodyear, supra, of one of policies of the London Market Insurers. The trial court further explained that "[i]f Goodrich should select different coverage, London will be required to pay up to the limits of the *Page 45 
coverage obligations of the selected London policy or policies with interest calculated thereon." The London Market Insurers have failed to demonstrate any error in the trial court's award of post-judgment interest and their third assignment of error is overruled.
 {¶ 134} The London Market Insurers' first, second, third, eighth and ninth assignments of error are overruled.
 Discovery of Claims Handling Materials CROSS-ASSIGNMENT OF ERROR I AGAINST C.U. "THE TRIAL COURT ERRED BY HOLDING BOONE DID NOT APPLY TO THE PRE-DENIAL CLAIM MATERIALS REQUESTED BY GOODRICH AND BY FAILING TO COMPEL THEIR PRODUCTION."
 {¶ 135} Through its first cross-assignment of error against Commercial Union, Goodrich contends that the trial court erred in denying its motion to compel Commercial Union to produce certain pre-denial claims handling materials that allegedly would have supported its claim for punitive damages on the bad faith claim against Commercial Union. Goodrich argues that it was entitled to discovery of these materials pursuant to the Ohio Supreme Court's holding in Boone v. VanlinerInsurance Co. (2001), 91 Ohio St.3d 209.
 {¶ 136} Citing Boone, 91 Ohio St.3d 213-14, the trial court did grant Goodrich's motion to compel discovery of pre-denial claims materials from Commercial Union to the following extent:
 "The insured is entitled to discover claims file materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage. At that stage of claims handling, the claims files will not contain work product[.]"
 {¶ 137} Goodrich maintains that the trial court misconstruedBoone and interpreted it too narrowly. Specifically, Goodrich maintains that in a bad faith claim, Boone requires discovery *Page 46 
of pre-denial materials, including materials outside the claims file and attorney work product. This Court disagrees.
 {¶ 138} Other jurisdictions may have interpreted Boone to support Goodrich's position, but this Court has not. See, e.g., Garg v. StateAutomobile Mut. Ins. Co., 155 Ohio App.3d 258, 264-265, 2003-Ohio-5960
(Second District Court of Appeals construing Boone more broadly). In its discovery orders, the trial court quoted directly from theBoone opinion and applied the syllabus law verbatim. This Court finds no error in the trial court's application of Boone.
 {¶ 139} Although Goodrich quotes selected language from theBoone opinion that suggests that work product may also be discoverable, the Boone majority clearly explains its holding as it pertains to work product:
 "[W]e hold that in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover claims file materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage. At that stage of the claims handling, the claims file materials will not contain work product, i.e., things prepared in anticipation of litigation, because at that point it has not yet been determined whether coverage exists." Boone, 91 Ohio St.3d at 213-214.
 {¶ 140} Nothing in the Boone holding supports Goodrich's assertion that it was entitled to discover Commercial Union's work product or materials outside the claims file. Goodrich has failed to demonstrate that the trial court construed Boone too narrowly or that it otherwise misapplied Boone. Goodrich's first cross-assignment of error against Commercial Union is overruled.
 Verdicts for Other Defendants CROSS-ASSIGNMENT OF ERROR VI AGAINST C.U. CROSS-ASSIGNMENT OF ERROR VII AGAINST LONDON "THE TRIAL COURT ERRED IN ENTERING JUDGMENT FOR INA ON GOODRICH'S BREACH-OF-CONTRACT CLAIM." *Page 47 
 CROSS-ASSIGNMENT OF ERROR VII AGAINST C.U. CROSS-ASSIGNMENT OF ERROR VIII AGAINST LONDON
"THE TRIAL COURT ERRED IN ENTERING JUDGMENT FOR CAL UNION ON GOODRICH'S BREACH-OF-CONTRACT CLAIM."
 {¶ 141} Goodrich contends that the trial court erred in entering judgment for the Insurance Company of North America ("INA") and California Union Insurance Company ("Cal Union") on its breach of contract claims against them.
 {¶ 142} As noted above, most of the defendant insurers settled with Goodrich before or during the trial. By the time the case went to the jury, Goodrich had breach of contract claims against four distinct defendants or defendant groups (Commercial Union, the London Market Insurers, INA, and Cal Union). The jury was given general verdict forms on the breach of contract claim against each of the four defendants and, at the same time, was given four sets of written interrogatories to answer on each separate breach of contract claim. The jury returned general verdicts for Goodrich against Commercial Union and the London Market Insurers and for INA and Cal Union against Goodrich.
 {¶ 143} Goodrich contends that the jury's answers to the written interrogatories pertaining to INA were inconsistent with its answer to interrogatories pertaining to Cal Union and/or Commercial Union. Goodrich contends that, pursuant to Civ.R. 49(B), the trial court was required to address these inconsistencies.
 {¶ 144} Civ.R. 49(B) provides, in relevant part:
 "When the general verdict and the answers [to written interrogatories] are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial." *Page 48 
 {¶ 145} Goodrich has failed to demonstrate that Civ.R. 49(B) had any application here because there were no inconsistencies between any of the four general verdicts (pertaining to Commercial Union, the London Market Insurers, INA, or Cal Union) and the answers to written interrogatories that corresponded to each particular general verdict. The jury's answers to the set of interrogatories pertaining to each of the four defendants was entirely consistent with its general verdicts for INA and Cal Union, and its general verdicts for Goodrich and against Commercial Union and the London Market Insurers.
 {¶ 146} Goodrich merely raised inconsistencies between the jury's findings on the distinct facts pertaining to the different defendants, not any inconsistency between the answers to interrogatories and the general verdict on any one defendant. Therefore, Civ.R. 49(B) was inapplicable and the trial court did not err by failing to reconcile any inconsistency in the jury's answer to written interrogatories between different defendants. The sixth and seventh cross-assignments of error against Commercial Union and the seventh and eighth cross-assignments of error against the London Market Insurers are overruled.
 III. {¶ 147} Goodrich's third cross-assignment of error against the London Market Insurers is sustained. The remaining assignments of error and cross-assignments of error are overruled.
The judgment of the Summit County Court of Common Please is affirmed in part and reversed only insofar as it failed to award prejudgment interest against the London Market Insurers. The cause is remanded solely to address the issue of prejudgment interest against the London Market Insurers.
 Judgment affirmed in part, reversed in part, and cause remanded. *Page 49 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to all parties equally.
SLABY, J., MOORE, J. CONCUR
[1] Although these insurers are individual entities, for ease of discussion and for consistency with the parties' practice throughout the trial, they will be referred to as a collective group throughout most of this opinion.
[2] Although Commercial Union also reiterates arguments that it raised through its second and fourth assignments of error, to avoid redundancy, this Court will confine its review of those arguments to the appropriate assignments of error.
[3] There is no dispute that some of the insurance policies of each of these insurers included no pollution exclusion. Consequently, this exclusion pertains to only some of the relevant policies and is not fully dispositive of the coverage issue as to either appellant. *Page 1